COPELAND *v.* ROBERTSON

No. 41153          May 18, 1959          112 So. 2d 236

*Watkins & Eager, Harmon W. Broom,* Jackson for appellant.

100

*Pierce & Waller,* Jackson, for appellee.

ETHRIDGE, J.

This is the second appearance of this cause here. Robertson v. Copeland (Miss.) 97 So. 2d 512. Mrs. Laverne D. Robertson had sued Dr. E. A. Copeland to recover damages for his alleged malpractice in performing on her a complete hysterectomy. At the close of the evidence for the plaintiff, the trial court sustained a requested peremptory instruction for the defendant. On appeal here, this Court, in holding that the directed verdict should not have been given, said that there was "a clear issue for the jury on conflicting testimony as to whether or not the defendant was justified in operating on the plaintiff at all at the time he did or in the manner in which the operation was performed." The cause was therefore reversed and remanded for a new trial. On the second trial, the issue was submitted to the jury, and there was a verdict for the plaintiff in the sum of $17,500. From the judgment entered thereon, Dr. Copeland appealed.

Mrs. Robertson testified that, when she went to Dr. Copeland's hospital on March 7, 1954, she was not concerned with her female organs at all; that she had a terrible cold; that her leg was hurting her; and that she was afraid she had polio. Dr. Copeland told her that she

had an ovarian cyst, which it was necessary to remove, but that he said nothing about removing her female organs. She was corroborated in this particular by T. L. Dixon and Mrs. Bobbie Sylvester, her father and sister. Mrs. Sylvester testified that the doctor, after first saying that he would operate, then informed her that he would not do so because the insurance company would not pay for the expense. Later the doctor said that the insurance company informed him that it would pay, and that he was going to operate on her on Tuesday, March 9th. Mrs. Robertson denied that she agreed to an exploratory operation. A day or two after her discharge from the hospital, because of frequent bowel movements, nausea of the stomach, swelling in the lower part of her body, soreness of her female organs, and the appearance of a rash, Mrs. Robertson went back to the hospital. She was treated for several weeks, both in and out of the hospital, and, failing to get any relief, she finally went to Dr. Edward R. North.

Dr. Copeland was called as an adverse witness for the purpose of cross-examination. Both his original hospital record and an amendment thereto were introduced in evidence. The record showed, and he admitted, that he performed a complete hysterectomy on Mrs. Robertson; that he took out the uterus, the Fallopian tubes, and a cystic like abscess on the right ovary; that he punctured a watery cyst on the left ovary; and corrected a defect in a previous operation where the bladder had been stitched down. He had previously examined this patient, and, on August 18, 1953, had addressed a letter to the Dependent's Clinic at Keesler Field, advising that he had found her with an enlarged spleen, considerable tenderness throughout the abdomen, a bad discharge which had partly cleared up, a fractured coccyx, and colitis. He was later appraised of the result of her examination and treatment at that hospital for approximately ten days, when the

final diagnosis and conclusion was "Salpingitis, chronic E. coli, paracolon species, cured."

In Dr. Copeland's history sheet, among the complaints then registered was "Stomach swells often with pains going into upper stomach, drawing leg also." The admittance diagnosis was "Acute pelvic inflammatory disease." The physical examination and findings were: "High state of nervousness. Very rigid in abdomen, suffering sever abdominal pain with shock and weakness. Hard mass in cul-de-sac." The doctor testified that Mrs. Robertson came into the hospital on Sunday afternoon, March 7, 1954, all drawn over to one side, complaining of severe abdominal pains. She had a greatly "extended" bladder, a rapid pulse, was perspiring, and showed symptoms of shock. He found a discharge from the cervix, pus in the tubes, and a hard mass in the cul-de-sac. His diagnosis was a recurrent pelvic inflammatory disease with pus in the tubes, endometritis, and a cystic ovary. It was his opinion that this situation constituted an emergency, and that she should have surgery to get rid of the tubes. He further testified that he so informed Mrs. Robertson, and that she replied "That's what I came in here for."

Dr. North, who qualified as an expert in obstetrics and gynecology, with a wide experience in the treatment of female diseases and surgery on the female organs, testified that he first saw Mrs. Robertson on April 29, 1954. The pelvic examination at that time disclosed "at the top of the vagina, all the way up at the dome, a large mass of tissue which was a raw granulating type of proud flesh, which was a bloody rotten sort of mass, about the size of a golf ball, which had a good deal of discharge * * *" The tenderness and thickening around this mass indicated an inflammatory condition. There was complaint of bloating, swelling, pain, and frequent bowel movements, and she was in a highly emotional state. He treated her intensively for about two and one-half months. He ad-

mitted her to the Baptist Hospital on July 15, 1954, for gastro-intestinal tests, and, on July 20th, operated. In the abdomen, massive adhesions stuck the intestines together, and existed throughout the pelvis and the cul-de-sac, and this condition accounted for her pain. The right angle of the vaginal cuff had broken loose and the round ligament was hanging loose in the abdomen. A right ovarian cyst was plastered down by adhesions, causing the destruction of the ovary and making it necessary to move the residue. By this operation, the doctor released the adhesions, revised the vaginal cuff and eliminated the inflammation, removed scarred tissue, got the bladder flap up, and mollified the difficulty of the acute infection in the neck and bladder wall.

Inasmuch as Dr. Copeland's record showed that he admitted Mrs. Robertson to the hospital for acute pelvic inflammatory disease, it was Dr. North's opinion, from that record, and from what he learned in his operation, that pus leaked out of the tubes into the abdominal cavity, causing a generalized peritonitis, and that such infection and rough handling of the bowel during surgery accounted for the massive adhesions.

Dr. North further testified that, according to the standard of treatment among doctors in the City of Jackson, if pus is running out of a boggy womb and the tubes are full of pus, the patient should be given massive doses of antibiotics, sulfa, penicillin, streptomycin, etc., until there is no longer any pus, until the tenderness is gone, and until the infection is sterile, in which event there may then be no need whatever for surgery. A boggy infected uterus, running pus, should not be removed because to remove the womb, clamps have to be put across the infected tissue that supports it; when this tissue is cut, there is contamination of the pelvic cavity; and to cut through the infected tissue around the womb and take it out is one of the cardinal sins of surgery. If there is pus in the cul-de-sac, it should be drained from below. The use of anti-

biotics is the treatment for salpingitis, and the female organs should never be removed unless absolutely necessary. A surgeon should never operate where the patient has a severe cold or is in shock unless absolutely necessary. To diagnose acute inflammatory pelvic disease, it is necessary to have a blood count, a urinalysis, an examination of the female organs and of the abdomen and the pelvis. The purpose thereof is to determine whether there is fever, shock, blood pressure too high, or infection, and whether acute or chronic.

The witness further said that, according to Dr. Copeland's operative sheet, he provided no drain; that there was nothing on the sheet to indicate shock, as the blood pressure did not appear; that there was nothing to indicate an emergency; and that it did not show temperature, respiration, or pulse.

Dr. Robert B. McLean, who qualified as an expert in general surgery and gnecology, with particular training in necessary operations on female organs, testified that adhesions result in proportion to the amount of trauma and infection; that, if gentle and clean, there are few; but if rough and infectious, there are more. Among doctors in the community of Jackson the standard procedure is to have a complete history and physical examination before doing a hysterectomy. The accepted treatment is to drain until the acute stage subsides, and then operate only if necessary. An abscess on the ovary can be cured by the use of antibiotics; and the common opinion is that a hysterectomy should not be done in the presence of an abscess, for the reason that tissue is cut and infection can be spread to the adjacent area. In the presence of shock, the operation should be delayed. There is no immediate danger because of an abscess in the cul-de-sac and pus running from the uterus. He gave study to Dr. Copeland's history sheet and record, and said he could not find anything about temperature, pulse, respiration, blood count, or blood pressure. He could not understand

how there was a diagnosis of shock without a blood pressure reading. He said that an acute pelvic inflammatory disease, such as Dr. Copeland's diagnosis, is rarely operated on during its acute stage. With acute pus tubes, it is not satisfactory, the results are not good, and morbidity is high. He said that, with this disease, the patient is very sick, there is high fever, and the blood count is elevated. But in Dr. Copeland's record, such count was not elevated. There is nothing in his record to indicate such a disease. The operation was not an emergency. If the patient had an ovarian cyst, she would have been sicker than the record indicated; and if she was sick and had the pus and fever which go along with that diagnosis, she was operated on too soon.

This witness then explained that, if Dr. Copeland made an honest mistake, upon opening the patient up and finding the infected tubes and ovaries, he ought, under standard practice, to have taken out the tubes, drained the ovaries, left the uterus, and "got out." Endomentritis, an inflammation of the lining of the uterus, does not call for surgery. It calls for conservative treatment. Salpingitis also calls for conservative treatment.

Mrs. Robertson, at the time of the operation, was twenty-four years of age and was the mother of two children. Prior thereto, she was an efficient stenographer, regularly employed, and earning $220 per month. She testified that, since the operation, she had been able to work only periodically, and had sustained a loss in earnings of more than $6,000; that her hospital expenses aggregated $1,126.08; and that her doctors' bills amounted to $1,597.70. It was further shown that she suffered a nervous breakdown in January 1945, which required hospitalization. She further testified to the severe pain and suffering which she had endured, and which she was still undergoing at the time of the trial; that the frequent bowel movements and going to the bathroom are not only a source of much discomfiture, but center on her the at-

tention of those around, with the result that she is greatly embarrassed and humiliated. Dr. North gave an elaborate description of the appellee's condition from the time when he first examined her until the date of the trial, and was of the opinion that she has sustained a serious injury which is permanent in character, and that her medical and hospital expenses were necessarily incurred.

A photograph of the appellee, made before the operation, was offered in evidence. There was evidence too that, before the operation, she weighed 105 pounds, had a beautiful complexion, did not wear glasses, her clothes fit well, and she did not have to make frequent trips to the bathroom, whereas now, she weighs 125 to 130 pounds, her complexion has been ruined with bumps on her face, she has to wear glasses, her stomach stays swollen, and she has to go to the bathroom often.

Dr. Copeland, in defense, testified that he explained to the appellee that it was necessary for him to do an exploratory operation and that she was willing and insistent; that after the operation, she was highly pleased, said that she felt like a different person, and made no complaint whatever; that he thought she perhaps had a general peritonitis, and that he would do wrong, if he did not operate; and that he regarded it as an emergency because he thought the tubes were leaking and also because of the bladder condition. He admitted that he testified, in the first trial, that Mrs. Robertson was having chills which were caused from pus in the tubes. While the history sheet showed that she was in shock, he testified that she was in a light degree of shock when she came in, but was not so affected when he operated. His attorneys, in their questions to him on direct examination, read to him copiously from recognized medical books on the questions at issue. He answered in detail that he followed those authorities, and insisted that, in the operation, he met the required standards and did his work in conformity with the best practice.

Dr. M. L. Batson, an eye, ear and nose specialist, testified that he had known Dr. Copeland for fifty years and that he had "a great deal of respect for his ability and for his integrity." Dr. H. C. Ricks, Director of Laboratories of the State Board of Health, had never seen Dr. Copeland operate, but he "would assume that Dr. Copeland was capable and qualified in every way." Dr. Temple Moore, who had known Dr. Copeland for twenty-eight years and had observed him perform various types of operations, testified that the doctor followed the standards of the medical profession in this community. Dr. Toxie E. Hall, now practicing medicine at Belzoni, Mississippi, had assisted Dr. Copeland as a surgeon in his hospital several years before, and he was of the opinion that the doctor "is a highly skilled surgeon."

■■ ■ As to the general standards of skill and care required of physicians and surgeons, 41 Am. Jur., Physicians and Surgeons, Section 82, pp. 200-201, says: "It is the universal rule that a physician is liable to his patient for a failure to exercise requisite skill and care. By that it is meant that a physician must possess that reasonable degree of learning, skill, and experience which ordinarily is possessed by others of his profession, and that he must exercise reasonable and ordinary care and diligence in the exertion of his skill and the application of his knowledge, and exert his best judgment as to the treatment of the case intrusted to him—*in short, a physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases.* The terms 'physician' and 'surgeon' here are used interchangeably, the courts making apparently no attempt, so far as this point is concerned, to distinguish their respective liabilities; and the practitioner is equally responsible in either case, whether the injury results from want of skill or want of care." See also 70 C. J. S., Phy-

sicians and Surgeons, Section 41, pp. 946-949. (Emphasis supplied.)

This Court is in accord with the above general rule. In Sanders v. Smith, 200 Miss. 551, 27 So. 2d 889, the opinion, in analyzing Engleking v. Carlson, 13 Cal. 2d 216, 88 P. 2d 695, a California case, said: "It (the law) requires only that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality, and that he shall use ordinary care in applying that learning and skill to the treatment of his patient." The opinion also analyzed Ewing v. Goode, 78 F. 442, which had cited the California case, and observed that it "announced the doctrine that whether a physician has used ordinary care in applying the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality is generally a question for experts, and can be established only by their testimony unless the matter in issue is within the common knowledge of laymen."

Where the evidence is in dispute on the question of negligence, the issue is for the jury. Robertson v. Copeland, supra; Rainey v. Horn, 221 Miss. 269, 72 So. 2d 434; 41 Am. Jur., Physicians and Surgeons, Section 132, p. 246; 70 C. J. S., Physicians and Surgeons, Section 63, pp. 1010-1013.

There were conflicts in the evidence on this trial, both as to whether the operation should have been performed at all or in the manner in which the operation was performed, just as there were in the first trial. This being true, the law of the case was settled on the first appeal, and the cause was properly submitted to the jury.

The appellant earnestly contends that the verdict was contrary to the great weight of the evidence. The substantial versions, highly conflicting, have been set out, and this Court cannot say that the verdict was not in accord with the great weight of the evidence, nor can it be said to be grossly excessive.

The appellant also maintains, apparently with great sincerity, that three instructions, on the merits, the measure of damages, and the form of verdict, respectively, which were given for the appellee, were erroneous and constituted reversible error.

■■■ The first instruction prefatorily announced the rule as stated in the authorities, cited above, and further told the jury that if they believed "from a preponderance of the testimony in this case that the defendant failed to use and exercise such reasonable and ordinary care, skill and diligence, in diagnosing, treating and operating on the plaintiff, and that plaintiff was injured and damaged thereby, then the defendant was guilty of negligence, and liable for all damages sustained by plaintiff as a proximate result of such negligence, if any, shown by the testimony, and it is your sworn duty to return a verdict for the plaintiff."

The instruction is clear, unambiguous, and correstly announced the applicable principle.

■■■ The second instruction was correct and misleading in no way. It informed the jury that if they found for the plaintiff, it would be their duty to fix the amount of the damages at such sum as would be reasonable and fair compensation for the injuries sustained by the plaintiff, if any, as a proximate result of the negligence of the defendant, if any. To that end, the jury was authorized to give consideration to the evidence as to hospital bills, doctor bills, past, present and future pain and suffering, permanent disfigurement, humiliation and embarrassment, and impairment of earning capacity, *if any,* in each instance. All of these items have been approved as elements of damages. Chapman v. Powers, 150 Miss. 687, 116 So. 609; Curry and Turner Construction Co., Inc., et al. v. Bryan, 184 Miss. 44, 185 So. 256; Vascoe v. Ford, et al., 212 Miss. 370, 54 So. 2d 541; Gulf, M. & N. R. R. Company v. Kelly, 178 Miss. 531, 171 So. 883; J. W. Sanders Cotton Mill Co., Inc. v. Bryan, et al., 181

Miss. 573, 179 So. 741, and other cases too numerous to mention.

The third instruction was as follows: "The court instructs the Jury that if you find for the Plaintiff, your verdict may be in the following form:

" 'We the Jury find for the Plaintiff and assess her damages in the sum of $_____.'

"Write your verdict on a separate piece of paper, and fill in the blank space with the amount of your verdict."

There is nothing ambiguous or misleading about the above instruction. It afforded merely a form for the verdict, in case it was for the plaintiff; and advised the jury to write their verdict on a separate sheet of paper. Cf. Johns-Manville Products Corporation v. McClure, 46 So. 2d 539 (Miss.), where the trial judge gave the plaintiff the following instruction: "The Court instructs the Jury for the plaintiff, Byron L. McClure, that in event you find for the plaintiff, your verdict may be in the following form: 'We, the Jury, find for the plaintiff and assess his damages at $_____' writing your verdict upon a separate piece of paper and *filling in the amount sued for.'* (Emphasis supplied.) The amount sued for was $15,000, but the jury returned a verdict for only $11,550. The opinion said: "Had the jury returned a verdict for 'the amount sued for', to wit $15,000, a serious question would have arisen. They did not do so, and we are unable to find that they were thereby misled."

The Court is of the opinion that there is no real merit in any of the criticisms of these instructions.

The Court finds no reversible error in the record, and the cause is therefore affirmed.

Affirmed.

*McGehee, C. J.,* and *Holmes, Arrington* and *Ethridge, JJ.,* concur.

## ON EXCEPTIONS AND MOTION TO DISCHARGE APPEAL BONDS AS A SUPERSEDEAS

Appellee, Mrs. Robertson, recovered judgment against appellant, Dr. Copeland, for $17,500, in the Circuit Court, First Judicial District, Hinds County. On June 26, 1958 the appellant's motion for a new trial was overruled. Within less than ninety days from that date as required by Miss. Code 1942, Sec. 753, appellant, defendant below, filed an appeal bond in the amount of $10,000 with a surety company as surety, but it was filed "as a supersedeas appeal bond only to the extent of $10,000 and no more."

This bond was not in an amount sufficient to comply with the statute on supersedeas appeal bonds. Code Sec. 1163 requires supersedeas bonds to be in a penalty of 125 per cent of the amount of the judgment appealed from.

Thereafter, on October 22, 1958, which was in excess of the ninety days required by statute for the filing of an appeal bond, appellant filed another and additional supersedeas appeal bond, with himself as principal and two individuals as sureties, in the amount of $11,875. This bond provided that it was executed "as a supersedeas appeal bond only to the extent of $11,875 and no more." The aggregate of the two bonds filed by appellant is 125 per cent of the judgment appealed from.

Appellee has filed herein exceptions to the sufficiency of these bonds as a supersedeas, combined with a motion to discharge the appeal bonds as a supersedeas. Code Sec. 1976 provides for this procedure, and, "if the exception be sustained and the security be not immediately perfected, the appeal shall cease to operate as a supersedeas, and the supersedeas shall be discharged by order of the court. . ." Appellee contends that the penalty of neither bond is equal to 125 per cent of the amount of the judgment; that the second bond was filed more

than ninety days from entry of the judgment; that there is no joint and several obligation or undertaking on the part of the sureties in the two bonds, upon which, in the event of an affirmance of the judgment appealed from, this Court could enter a joint and several judgment against all of the obligors in the two bonds, as required by the statutes; and that the supersedeas bonds do not comply with the statutes.

On the other hand, appellant argues that Code Secs. 1163 and 1973 do not limit an appellant to filing one single bond; that the purpose of the statute is to protect the successful appellee in the event of an affirmance; that the aggregate of the two bonds is 125 per cent of the judgment appealed from, and appellee makes no complaint as to the sufficiency or solvency of either or both bonds. It is said appellant has complied substantially with the statute, and to require an appellant to get sureties who are willing to be responsible for the entire amount of a supersedeas bond would have the effect often depriving some unsuccessful litigants of a right to appeal.

The question is whether under the statutes different sureties may each bind themselves for a stated sum or portion of a required supersedeas bond, where the aggregate amount of the respective sums is the full amount required by law. This appears to be a question of first impression in Mississippi. Since the rights of appeal and to supersede a judgment are privileges granted by statute, the statutes must determine the right.

Miss. Code 1942, Sec. 1163 provides for supersedeas bonds: ''On appeal from any interlocutory decree, where the chancellor shall allow a supersedeas, and on appeal from a final decree of the chancery court, or the final judgment of a circuit court where the appellant shall desire a supersedeas, bond shall be given by the appellant, payable to the opposite party, with two (2) or more sufficient resident sureties, or one or more guaranty or

surety companies authorized to do business in this state, in a penalty of one hundred twenty-five per cent (125%) of the amount of the decree or judgment appealed from, or one hundred twenty-five per cent (125%) of the amount of the value of the property or other matter in controversy, to be determined by the officer granting the appeal, conditioned that the appellant will satisfy the judgment or decree complained of, and also such final judgment as may be made in the cause, and all costs, if the same be affirmed, and a supersedeas shall not issue until such bond shall have been given; and a supersedeas shall not be granted in any case pending in the supreme court, unless the party applying for it shall give bond as above required.''

This statute requires a ''bond'', in the singular, to be given. It must be in a penalty of 125 per cent of the amount of judgment appealed from. It must be conditioned that appellant will satisfy the judgment and all costs. The act states that ''a supersedeas shall not issue until such bond shall have been given.'' The ''bond'' to be given by the individual or corporate sureties must be in the stated amount. The sureties here in the two respective bonds have limited their liabilities to less than that amount. The statute contemplates that the sureties will be jointly and severally liable for the entire amount; they are not so liable here.

The conditions of the two bonds do not satisfy the requirements of Sec. 1163. Moreover, it must be read along with Code Sec. 1973, which provides for judgment on a supersedeas bond: ''In case a bond have been given for a supersedeas, the judgment of the Supreme Court, on affirming the judgment or decree of the court below, or on a dismissal of the appeal by the appellant or the court, shall be for the money adjudged or decreed against appellant, and damages and costs, or for the specific property and damages and costs, or for the damages and costs, as the case may be, against all the obligors in the bond who

may be living at that time, and execution may be issued thereon accordingly; and if any of the obligors be dead, his representatives may be summoned to show cause why judgment should not be rendered against them on the bond; and if good cause be not shown to the contrary, judgment shall be entered against them in like manner as against the living obligors, and certified to the court below, and execution may be issued thereon."

Sec. 1973 requires that the judgment must be "against all the obligors in the bond," and "shall be for the money adjudged or decreed against appellant, and damages and costs." The two bonds given in the instant case would not permit rendition of this type of judgment. A judgment could not be executed against all the obligors in appellant's two bonds for all of the money adjudged against appellant, if the case is affirmed.

For the foregoing reasons, we do not think that the supersedeas bonds filed by appellant comply with the pertinent statutes. Apparently some of the states permit the method followed by appellant, and others expressly or impliedly prohibit it. We construe the Mississippi statutes to be in the latter category. See 4A C. J. S., Appeal and Error, Secs. 542, 537(b). Such cases as New Orleans Ins. Co. v. Albro Co., 112 U. S. 506, 5 S. Ct. 289, 28 L. Ed. 809 (1884), and Guturrez v. Croner, 29 La. Ann. 827 (1877), are not relevant because based upon the particular statutes of those jurisdictions.

Several decisions support this construction of Code Sections 1163 and 1973. In Davidson v. Hunsicker, 224 Miss. 206, 80 So. 2d 834 (1955), it was held that dismissal of an appeal for failure to file appeal bond within the required time was a breach of its condition, and rendered sureties liable on it. It was said that Code Sections 1163 and 1973 "must all be read and considered together", and the judgment must be rendered "against all the obligors in the bond". In a suit on a supersedeas bond, the judgment will be entered against both individual sure-

ties, jointly and severally, for the total amount of the judgment and costs. Hemphill v. Hemphill, 199 Miss. 428, 24 So. 2d 855 (1946) ; Williams v. Shivers, 222 Miss. 626, 76 So. 2d 838 (1955). A supersedeas appeal bond signed by only one individual surety is defective. Pfeifer v. Hartman, 60 Miss. 505 (1882). It is not necessary for us to decide whether there must be strict or only substantial compliance with the statutes on supersedeas bonds. See 4A C. J. S., Appeal and Error, Secs. 646, 648. For reasons heretofore given, appellant has not substantially complied with the legislative requirements.

Appellee's exceptions and motion to discharge the appeal bonds insofar as they operate as a supersedeas are sustained, unless within thirty days from this date appellant files herein a good and sufficient supersedeas bond. If such is not given and approved within that time, the supersedeas will be discharged. Stewart v. State Highway Commission, 185 Miss. 328, 186 So. 633 (1939).

Exceptions and motion to discharge appeal bonds as supersedeas sustained, unless within thirty days from this date appellant files good and sufficient supersedeas bond.

*Roberds, P. J.,* and *Hall, Arrington* and *Gillespie, JJ.,* concur.

## ON APPELLANT'S PETITION FOR GRANT OF A WRIT OF ERROR CORAM NOBIS

Lee, J.

The appellant filed a petition to this Court for the grant of a writ of error coram nobis.

The affidavit of Harmon W. Broom, of counsel for the appellant, is to this effect: That, after the trial of this cause in the Circuit Court of the First Judicial District of Hinds County, Mississippi, and after the court, on June 26, 1958, overruled the motion for a new trial, on or about December 18, 1958, the affiant was contacted

over the telephone by Edward Clark Robertson, husband of the appellee, who advised that his wife had filed a bill of complaint against him for a divorce, and that she was therein complaining of the same damages against him as she had complained of in her suit against Dr. Copeland; that she had suffered no loss of consortium or injury from the operation of the doctor; that he would supply affiant with an affidavit to that effect; that affiant immediately procured a copy of the bill of complaint, and subsequently endeavored to take an affidavit or statement from Robertson, but that he refused to make the same; and that the divorce proceeding was continued, is still pending, and no answer has been filed.

The affidavit further states that, as a result of the conversation with Robertson, and, inasmuch as the appellee, during the trial, waived the privilege as between her and her physicians, the affiant proceeded to procure affidavits and statements from the various doctors to whom such waiver applied.

Also attached to the petition are: (1) the affidavits of five doctors, together with a letter from another; (2) a copy of the bill for divorce by the appellee against her husband, Edward Clark Robertson, in which habitual cruel and inhuman treatment was alleged as a ground; (3) a copy of the bill of complaint of Noba Mae Herrington against her husband, Jack Herrington, charging habitual cruel and inhuman treatment of her, and his answer and cross bill charging her with habitual cruel and inhuman treatment and adultery; and (4) a copy of the testimony of Robertson as a witness for Jack Herrington in that case, in which he testified to acts of adultery on the part of Mrs. Herrington, and stated that he and his wife were separated on account of his wife's association with Mrs. Herrington.

The appellant, in his brief, concedes that testimony by Edward Clark Robertson would not be admissible, saying: "It is not contended by this appellant and petition-

er that the testimony of Edward Robertson would be competent and admissible for consideration by this Court or the trial court in this cause," but that it was presented as proof of diligence.

The appellant's brief also makes the following concession: "Certainly when this Court views the testimony of the trial court presently before it, and places therein testimony by way of affidavits and statements of those doctors relied upon by the chief witness of the appellee, the expert witness, Dr. Edward R. North, Jr., it will reveal a direct conflict in what Dr. North attempted to convey and did convey to the trial court and jury".

Both the petition and the appellant's brief concede that the record, at page 353, shows that the appellee, during the trial, waived the privilege of physician and patient as to all of the doctors, whose affidavits or statements are attached to the petition. In supplement of that concession, the appellee's brief makes the statement, unchallenged by the appellant, that "She did that (made the waiver) on direct examination on Thursday, April 4, 1958, and the trial was not concluded until the Tuesday, April 8, 1959, which was Tuesday of the following week * * * the appellant made no effort to procure the testimony of these witnesses * * * no motion for delay * * * no subpoena issued for the physicians * * * the appellant chose to take advantage of the absence of the physicians by getting an instruction * * * " as follows: "The court instructs the jury at the request of the defendant that where a witness or witnesses are available by summons or process of court and are not presented as witnesses by plaintiff and where such witness or witnesses would naturally be friendly to plaintiff's cause, if you so believe from the evidence, the court then tells you, as a matter of law, the jury may presume that such testimony would have been adverse to the plaintiff and favorable to the defendant. That the burden of proof is at all times upon the plaintiff and who is charged under the

law with the duty of not only making out her case but by a preponderance of all of the testimony.''

Paragraph 7 in appellee's bill for divorce charged that her husband's conduct had aggravated the condition which resulted from the operations. It is as follows: ''Complainant would further show that she received a series of serious operations in March, 1954, and that such caused permanent damages to certain parts of her body and to her entire nervous system and that such cruel and inhuman treatment by the defendant has seriously impaired complainant's health and complainant verily believes that if such treatment continues, she will be rendered totally disabled.''

As a further reason for submitting the evidence of Edward Clark Robertson, which was taken in the case of Noba Mae Herrington against Jack Herrington, in addition to what he had allegedly told affiant Broom, the brief of the appellant says that ''this testimony also reflects the true character of one of the witnesses for the appellee, Mrs. Noba Mae Herrington''.

An analysis of the petition, the exhibits thereto, and the reasons therefor detailed in the brief, lead inescapably to these conclusions: (a) The evidence of Edward Craft Robertson, the husband of appellee, would not be admissible; (b) the evidence of some of the doctors, according to the affidavits, would, at most, be only contradictory of the expert evidence for the appellee; and (c) the evidence of Robertson in the divorce proceeding, if admitted, would merely go to the credibility of Noba Mae Herrington, a witness for the appellee.

In Lang v. State, Miss., 92 So. 2d 670, this Court said that the petition for a writ of error coram nobis ''will not be sustained if the newly discovered evidently is merely cumulative, or additional to that adduced at the trial; it will not be sustained if the newly discovered evidence merely tends to impeach other testimony offered at the trial * * * ''.

In Wetzel v. State, 225 Miss. 450, 7 So. 2d 188, this Court said: "But it is well established both in Mississippi and elsewhere that the writ of error coram nobis cannot be invoked for newly discovered evidence going to the merits of the issues tried in the court below." See the many citations there and the rationale for such a rule; and that it is not available to attack the credibility of the witnesses.

In Lang v. State, (Miss.) 100 So. 2d 138, this Court said: "Of course, if newly discovered evidence will not probably produce a different result or induce a different verdict, it is not sufficient to warrant the granting of a new trial." See cases there cited.

Besides, in the first Lang case, supra, the Court said that a petition for a writ of error coram nobis "will not be sustained if the petitioner or his attorney knew of the existence of such evidence at the time of the trial, or could have discovered it by the exercise of due diligence * * *".

After the waiver of the privilege on April 4, 1958, the trial continued until April 8, 1958. In view of the failure to take any steps to ascertain what the doctors would testify to, or to procure their attendance as witnesses during the trial, obviously it cannot be said that due diligence was exercised.

Besides, this Court now has jurisdiction of this cause. There is no such thing as divided jurisdiction. This Court cannot temporarily suspend its jurisdiction, confer the same on the circuit court to pass on this matter, and, after it has done so, to report back to this Court and thereby reinvest this Court with jurisdiction. Roberson v. Quave, 211 Miss. 398, 51 So. 2d 62 and 777.

From which it follows that the petition for a writ of error coram nobis must be, and it is, denied.

Petition denied.

All Justices concur.