This is a medical malpractice action, brought in the Circuit Court for the First Judicial District of Hinds County by Mrs. Veronica M. Ross, appellant, against Dr. Lucien R. Hodges, defendant-appellee. The declaration was based on two theories: Negligent selection and use of surgical instruments in the operation, and lack of informed consent by the patient to the operation. At the close of the plaintiff's case, the circuit court directed a verdict for defendant on the issue of informed consent, and sent the case to the jury on the negligence issues. We affirm the trial court's judgment based on a jury verdict for defendant.
Toward the end of January 1966, Mrs. Ross noticed a small lump on her head, and her gynecologist sent her to a radiologist to have it x-rayed. He thought it was a scalp tumor, and referred her to a general surgeon, Dr. George Twente, who concluded that she had a scalp tumor and arranged for an operation several weeks later. Mrs. Ross was admitted to the hospital as Dr. Twente's patient on March 27, 1966. When admitted, she signed a "Consent for Admission and Treatment" form, which read in part:
 1. I * * * am * * * suffering from a condition requiring diagnosis and treatment, voluntarily consent to such procedures, treatment and operations as are considered necessary by Dr. Geo. Twente, his assistants or designees.
 2. I am aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me as to the result of treatments or examinations in the hospital.
 * * *
 6. This form has been fully explained to me and I certify that I understand its contents.
Pursuant to orders by Dr. Twente, Dr. Evans made x-rays, which he interpreted to show a "lesion" of the skull, diagnosed as an "intra-diploic epidermoid." Dr. Evans observed that such a lesion is "supposed to *Page 907 
be benign, but it does grow and due to the fact that it grows and becomes larger, I guess you would have to say it is malignant." Dr. Twente requested Dr. Lucien Hodges, the defendant, to see Mrs. Ross, and he did so. Dr. Hodges first prescribed an arteriogram, which involved inserting a needle in an artery in the neck and injecting dye into the brain. Mrs. Ross said that "it just scared me to death." The radiologist concluded, from the arteriogram, that "there is no huge amount of displacement inward of the tumor." After the test, Dr. Hodges showed Mr. Ross, appellant's husband, the x-rays on a lighted screen and explained the results of the test. There seems to be no question but that the operation was going to be performed.
Mrs. Ross was concerned that she might have to have her entire head shaved, so Dr. Hodges explained that this would not be done, only a small area would be shaved and cosmetically her hair could be combed over it. Both Mrs. Ross and her husband understood that the procedure consisted of physically cutting into the skull to remove a section of the bone. According to Mrs. Ross, when Dr. Hodges told her about the operation to be performed the next morning, he said:
 He told me there wasn't anything for me to worry about, that there wasn't going to be anything to it. I was worrying about having my head shaved. He said, `Don't worry about that. You won't even be able to tell it. It will just be a small area and you will be able to cover it up.' And he told me he was going to use this little saw — s-a-w (spelling) saw. That it wouldn't take very long. I thought he said about forty-five minutes. I remember him saying something like that.
Mrs. Ross also said that she thought it was going to be a "simple operation" for a neurosurgeon, that it was not much more than a scalp tumor, and she did not think the brain would be involved, although she was concerned that she "might have a malignant tumor." She stated that the doctor "never mentioned any danger or any risk," and that she would not have had the operation if she had thought she might have any paralysis.
 I.
No issue is made as to the training, experience and competency of Dr. Hodges as a neurosurgeon. The conflicting evidence was directed toward alleged negligence in selection of surgical instruments and in their use. Both issues, we think, were questions for the jury, which decided adversely to plaintiff. Dr. Hodges testified in great detail as to the reasons why he selected a circular, two-inch traphine saw with which to remove the fibrous dysplasia of the bone, instead of using a goose-neck rongeur or a Gigli saw. The reasonableness of this selection of instruments is supported to a substantial extent by the testimonies of Drs. Azordegan and Echols, neurosurgeons who testified for plaintiff, as well as by Drs. Murphy and Andy, neurosurgeons who testified for defendant.
On the issue of negligence in the use of surgical instruments in this operation, Dr. Hodges testified in great detail about every step of the operation and every procedure used therein. His surgical nurse also testified about the operation, by a deposition introduced in evidence. Four neurosurgeons, two as witnesses for plaintiff and two as witnesses for defendant, testified concerning their experiences and knowledge about such operations. From the tests made, Dr. Hodges thought that he could get completely around the bony lesion in the skull with the traphine saw and remove the lesion entirely. At intervals in revolutions of the saw over the surface of the skull, he removed the saw, irrigated the perforation, and examined its depth into the skull. A human skull is not only somewhat rounded, but varies in thickness. As he was using the traphine saw, the back edge of it suddenly and *Page 908 
unexpectedly cut through part of the diseased bone and lacerated the dura (a thin lining of the brain) and a very small area of the brain's cortex. This cut a blood vessel on the surface and required immediate hemostasis by means of electrocoagulation. The laceration was about a centimeter in length, and was very superficial in depth, but required a probing for the artery in order to stop the bleeding. As a result, Mrs. Ross unfortunately suffered a neurological deficit in her left hand, arm, shoulder and face. Several months later, Dr. Azordegan performed a cranioplasty on Mrs. Ross, covering the aperture in her skull. Dr. Dean Echols, a neurosurgeon of New Orleans, examined Mrs. Ross on June 29, 1968, and testified as her witness. He stated that Mrs. Ross has a spastic left upper extremity, especially the forearm, wrist, hand and fingers, and cannot use her shoulder and elbow very well. The weakness in her face has "almost completely cleared up and is not a problem at all," although she still has a sensation of numbness in the left half of her face.
Dr. Echols and the other neurosurgeons testified in substance that damage to the covering of the brain and sometimes a little cutting of the surface with the saw is quite common, but that it is an extreme rarity and a remote possibility that a neurological deficit would result.
In summary, the evidence made issues of fact for the jury on both selection of surgical instruments and their use by Dr. Hodges. Since the jury found for the defendant in these respects, those findings will not be disturbed.
Further, this was not a res ipsa loquitur case. All the facts were before the jury and there was no room for presumptions or inferences. DeLaughter v. Womack, 250 Miss. 190, 164 So.2d 762
(1964); Milner Enterprises, Inc. v. Jacobs, 207 So.2d 85 (Miss. 1968). Nevertheless, plaintiff was given a res ipsa loquitur instruction. Defendant was granted an instruction which told the jury that they "may not presume negligence solely because of the untoward results of such surgery," and that if it believed from the credible evidence that defendant exercised that degree of skill and learning and care ordinarily exercised by neurosurgeons in good standing in the community, in the selection and use of instruments, it should return a verdict for defendant. Since this was not a res ipsa loquitur case, the trial court could properly grant this instruction. DeLaughter v. Womack, supra; Milner Enterprises, Inc. v. Jacobs, supra. The condemnation of this instruction, stated in Fisher v. Daniels, 252 Miss. 662,173 So.2d 908 (1965), and Johnson v. Foster, 202 So.2d 520 (Miss. 1967) precludes giving it only in cases where the res ipsa doctrine applies. The jury was amply instructed on the issues concerning selection of instruments and skill in the use of them, and there were no errors in the granting or refusing of instructions on these issues.
 II.
The remaining question is whether the circuit court erred in granting a directed verdict for defendant at the close of plaintiff's case on the issue of informed consent. The basis of that doctrine of tort liability is that a physician is under a duty under some circumstances to warn his patient of the known risks of proposed treatment or surgery, so that the patient will be in a position to make an intelligent decision as to whether he will submit to such treatment or surgery. Shetter v. Rochelle,2 Ariz. App. 358, 409 P.2d 74 (1965), modified and rehearing denied, 2 Ariz. App. 607, 411 P.2d 45 (1966); Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139 (1966).
Appellee argues that the suit was barred by the one-year statute of limitations on assault and battery claims. Miss. Code 1942 Ann. § 732 (1956). The trial court correctly overruled appellees' plea to that effect. An action on lack of informed *Page 909 
consent is in tort and is governed by the general six-year statute of limitations. Miss.Code 1942 Ann. § 722 (1956); Mayor v. Dowsett, 240 Or. 196, 400 P.2d 234 (1965); Physicians' and Dentists' Business Bureau v. Dray, 8 Wn.2d 38, 111 P.2d 568
(1941); see Wilder v. St. Joseph Hospital, 225 Miss. 42,82 So.2d 651 (1955).
The question is whether Dr. Hodges disclosed to plaintiff sufficient information about the proposed operation to constitute informed consent. After a careful examination of the evidence offered by plaintiff, we think he did.
Plaintiff had the burden of proving, in this respect, the professional standard according to the customs of medical practice of neurosurgeons in this area. Both Dr. Azordegan and Dr. Echols, plaintiff's neurosurgical witnesses, stated that it could not be known whether the lesion was malignant without surgery. Dr. Hodges told her that it should be removed, since the patient had told him the growth was enlarging. Mrs. Ross and her husband both clearly understood that the surgery would involve shaving a part of the head and sawing into the cranium for the purpose of removing the lesion. Both Drs. Azordegan and Echols, witnesses for plaintiff, agreed that the chance of a neurological deficit from surgery of this kind is remote and extremely rare, even though there is always a chance of tearing the dura and the surface of the cortex. Dr. Azordegan said that he would tell the patient that these tests had been made and he would like to take the lesion out; that he was going to shave her hair, put her to sleep, remove the bone and replace it with a substitute. Azordegan said that it was a simple operation because "I don't believe it is a major operation, honest * * * This is one of simple surgery." He would make himself available for any questions which the patient wished to ask. He would avoid frightening a patient. In the absence of questions from the patient, he would not discuss with her remote possibilities which might occur.
Dr. Echols said that, if he is going to operate for a tumor of the bone, he does not tell the patient that there is a chance of damaging the dura, nor does he advise the patient that some paralysis might result from this procedure. He tries to reassure his patients rather than frighten them, and thinks the operation is "about as safe an operation as a person could have on their head, it isn't a brain operation." Echols said that a surgeon tries to combat a patient's nervousness and anxiety by reassurance, where possible.
At the close of plaintiff's case it was manifest that Dr. Hodges had complied with the professional standards of neurosurgeons in this and other communities, in terms of disclosure to the patient. He had related his diagnosis and explained in general the proposed operation. Mrs. Ross knew that her head would be shaved, and that Dr. Hodges would saw a hole in the skull in order to remove the bony lesion. She understood the essential character of the operation to be performed. There is no showing that this was a particularly dangerous operation or that the risks were great. The unfortunate result achieved by plaintiff was not probable, only remotely possible, and all reasonable people must understand that there is some risk incurred in surgery.
The earlier quoted testimony of Mrs. Ross as to what Dr. Hodges told her reflects that he advised her of the essential character of the surgery and coupled it with words of reassurance. In overall context, Dr. Hodges' statement to Mr. Ross (according to the latter) that it was "a simple operation" also must be related to the procedures of sawing into the patient's skull, the rarity of a neurological deficit, and to Dr. Azordegan's frank statement that surgery to remove a bony lesion of the skull was a simple operation. It must also be borne in mind that a surgeon's primary concern at the time of *Page 910 
consultation about surgery is and should be the best possible treatment of his patient's illness, not preparation for the defense of a possible lawsuit. Under all of the circumstances, the circuit court was justified in granting a directed verdict for defendant at the close of plaintiff's case on the issue of informed consent.
Affirmed.
All Justices concur.