490 So.2d 861 (1986)
Ann Marie MARSHALL and Jimmie D. Marshall
v.
THE CLINIC FOR WOMEN, P.A.
No. 56245.
Supreme Court of Mississippi.
June 4, 1986.
*862 H.L. Merideth, Jr., Merideth & Daniels, Greenville, for appellants.
L. Carl Hagwood, Campbell & DeLong, Greenville, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
From a directed verdict rendered by the Circuit Court of Washington County, in favor of the defendant below, Ann Marie Marshall and Jimmie D. Marshall appeal to this Court.
Mrs. Marshall developed some complications while using birth control pills, and went to The Clinic for Women, P.A., because she knew they fitted patients with IUD devices. In 1972, she was fitted with such a device called the Dalcon shield.
Mrs. Marshall used this device without any problems until 1974, when it was removed so that she could become pregnant. Mrs. Marshall subsequently had a child born in August of 1975. In October of 1975, she returned to the Clinic and requested another IUD. Dr. W.D. Byars, a physician at the Clinic, made the decision about what type IUD would be used and inserted the CU-7 on October 31, 1975. The CU-7 is manufactured by G.D. Searle & Company.
According to the testimony of Mrs. Marshall, Dr. Byars told her the CU-7 was safe, that his own wife wore one, and that he would not let his wife wear something that wasn't safe. Mrs. Marshall further testified, however, that Dr. Byars also told her "Now if there's any excessive bleeding, abdominal pain, nausea, dizziness, or fever, be sure to call me back."
Mrs. Marshall was also given a card which she later threw away that stated when the CU-7 was inserted and when it was to be removed. After the insertion of the CU-7 in June of 1976, Mrs. Marshall, on occasion, called the Clinic asking about pain she described as "like lightning striking down". Mrs. Marshall only talked with nurses or the receptionist and did not go in to see Dr. Byars because the pain did not persist.
Mrs. Marshall stated that the first time she noticed bad pains was in the Fall of 1976. She testified that she called the Clinic and was assured that this was normal. There was, however, no record of any telephone calls made to the Clinic in Mrs. Marshall's medical records. Further, Mrs. Marshall could not remember the names of the people she talked to when she called.
In the Spring of 1977, Mrs. Marshall had some more severe pain and she called her sister-in-law, an employee at the Clinic, and told her that she, Mrs. Marshall, was going to see a doctor in Oxford. The 1977 pain was more persistent than the pain in the Fall of 1976. Mrs. Marshall went to see Drs. Stone and Howorth in Oxford. X-rays were taken which showed that the IUD was in place. She continued to suffer from pain, and on May 4, 1977, Dr. Stone sent her to Dr. Howarth, who diagnosed a pulled stomach muscle. The pain disappeared after about a week.
On October 7, 1977, Mrs. Marshall called the Clinic again, complaining of pain, and her sister-in-law told her to come on in to the Clinic. The next day Mrs. Marshall went to the Clinic and the CU-7 was removed. Between October of 1977 and May *863 of 1979, Mrs. Marshall had no complaints to report to the Clinic.
Commencing in January of 1978, the Marshalls began trying to have another child without success. She was informed by Dr. Byars that she probably needed a drug to help her but that she should see a doctor in Jackson because she would need to be checked on every month. The Marshalls lived in Jackson at this time.
Mrs. Marshall saw a Dr. Lucas in Jackson in December of 1978. He prescribed Clomid, a drug to help with ovulation. The Marshalls then moved back to Greenville, and Ann resumed her care with the Clinic. She had an examination on May 23, 1979, for the Clomid. She returned to the Clinic in September, October and November to be checked for the effects of the Clomid. When she started on this drug, she was informed that it could cause ovarian cysts.
When she still did not become pregnant but had developed a dull lower stomach pain, she called Dr. Byars, who informed her that if she wanted to stay on the Clomid she should stay on it, if she wanted to get off, she should get off, and that all women have pain. After this, on May 26, 1980, Mrs. Marshall went to Dr. McNeil, who was also associated with the Clinic. Dr. McNeil first put her on Clomid, then thought something may have been wrong and he performed a laparoscopy in June of 1980.
Dr. McNeil told Mrs. Marshall that her tubes might be blocked and this could have been caused by an infection. Dr. McNeil ultimately performed a laparotomy on Mrs. Marshall at King's Daughters Hospital in an attempt to remove adhesions from her fallopian tubes.
In December of 1982, Mrs. Marshall went to Houston, Texas, to go through the in vitro fertilization program. This program was not successful.
In June of 1983, Mrs. Marshall had a tubal pregnancy and two cysts were subsequently removed. She stated in the record that at the present time she still has pain, and doctors have told her that a hysterectomy will probably make the pain go away.
Dr. Waldemar Prichard, Jr., testified as an expert witness for Mrs. Marshall. He had seen her three times as a patient. In his opinion, Prichard felt "That the copper CU-7 IUD that she had was directly related to the cause of pelvic inflammatory disease."
At the conclusion of the plaintiff's case, the defendant moved for a directed verdict which was granted. Plaintiffs moved to reopen the case for further expert testimony from Dr. Prichard, and this motion was overruled. Plaintiffs' motion for a new trial was also overruled, and this appeal followed.

I.

WHEN A PHYSICIAN PROVIDES THE PATIENT WITH NO WARNING OF ANY RISK ASSOCIATED WITH A WHOLLY ELECTIVE TREATMENT AND A KNOWN RISK CAUSES THE PLAINTIFF'S INJURY, ANY JUSTIFICATION FOR THE PHYSICIAN'S FAILURE SHOULD BE AN AFFIRMATIVE DEFENSE AND EXPERT TESTIMONY FROM THE PLAINTIFF THAT THE WARNING WAS INADEQUATE SHOULD NOT BE REQUIRED
The gist of this assignment is that the Marshalls need not have put on expert testimony that any warning from Dr. Byars was inadequate but instead Dr. Byars, under the circumstances of this case, had an affirmative duty to inform Mrs. Marshall of the dangers and, therefore, Dr. Byars bore the burden of proving that he had adequately warned his patient.
In the case of Ross v. Hodges, 234 So.2d 905, 908 (Miss. 1970), we stated, "That a physician is under a duty under some circumstances to warn his patient of the known risks of proposed treatment or surgery, so that the patient will be in a position to make an intelligent decision as to whether he will submit to such treatment or surgery."
*864 Ross, supra, also puts the burden of proof of the standard of disclosure on the plaintiff to show, "the professional standard according to the customs of medical practice of neurosurgeons in this area." 234 So.2d at 909. We went on to say that, "It must be borne in mind that a surgeon's primary concern at the time of consultation about surgery is and should be the best possible treatment of his patient's illness, not preparation for the defense of a possible lawsuit." 234 So.2d at 909-10.
The Marshalls also cite the case of Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959), for the method of proving a medical malpractice case. In Copeland, we stated,
[T]hat whether a physician has used ordinary care in applying the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality is generally a question for experts, and can be established only by their testimony unless the matter in issue is within the common knowledge of laymen.
236 Miss. at 111, 112 So.2d at 241.
Since the trial of Copeland and Ross, this Court has adopted a national standard of care. See Hall v. Hilbun, 466 So.2d 856, 874 (Miss. 1985); Trapp v. Cayson, 471 So.2d 375, 380 (Miss. 1985). Nevertheless, there must be some testimony as to what the standard of care is.
In 1986, it could be argued that the fact that the use of an IUD held potential dangers in fertility was an issue within the common knowledge of laymen. It is questionable that this is true from the evidence presented in this record in 1975.
Dr. Prichard was the only expert witness that testified and he did not testify as to the standard of care imposed upon Dr. Byars. Dr. Prichard merely stated that it is known in the medical profession that there is an association between the use of an IUD and pelvic inflammatory disease, and that in his opinion he felt that the copper CU-7 directly related to the cause of Mrs. Marshall's pelvic inflammatory disease. Dr. Prichard did not testify as to anything that Dr. Byars did or should have done.
The Marshalls next assert that in some cases expert testimony is not required to prove that a physician has breached his duty of disclosure or informed consent.
In support of this, they cite Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (1960), and Calabrese v. Trenton State College, 162 N.J. Super. 145, 392 A.2d 600 (N.J.App. 1978), affirmed, 82 N.J. 321, 413 A.2d 315 (N.J. 1980), in support of this argument.
In Calabrese, the Court cited Natanson with approval, and stated,
Hence, in a case such as this one, where it is alleged that the physician failed entirely to advise plaintiff of any of the known and existing dangers associated with a proposed course of treatment, medical testimony establishing that such a failure constitutes a departure from norms of medical practice is not an essential element of a plaintiff's case. This is so because the doctor's duty of disclosure is imposed by law and not by medical consensus. A failure to disclose any of the known and existing risks of proposed treatment when such risks might well affect a patient's decision to submit or forego the treatment, therefore, constitutes a prima facie violation of that duty; in such a case it becomes the doctor's burden to establish through his own testimony or that of other medical experts that his failure squared with accepted medical practice.
392 A.2d at 606.
The Marshalls, therefore, argue that since there was a complete failure to warn on the part of Dr. Byars, the burden of justification of failure to disclose should shift to the physician.
We do not reach this argument, based on the facts present in this record.
We note that Mrs. Marshall fainted while on birth control pills and switched doctors to have an IUD.
We note by Mrs. Marshall's own testimony that when the CU-7 was inserted in *865 October of 1975, Dr. Byars cautioned her about excessive bleeding, abdominal pain, nausea, dizziness, or fever, and cautioned her to call him if any of the above events occurred.
Furthermore, Dr. Byars instructed Mrs. Marshall on how to check the string attached to the CU-7, and that this was to be done every month. If Mrs. Marshall could not feel the string she was to call Dr. Byars.
Calabrese, therefore, would not apply to the facts of this case.
This Court stated in Reikes v. Martin, 471 So.2d 385, 392 (Miss. 1985), that, "To recover under the doctrine of informed consent, as in all negligence cases, there must be a causal connection between the breach of duty by the defendant and the injuries suffered by the plaintiff."
Under the doctrine set forth in Ross v. Hodges, supra, the plaintiff bears the burden of proof to show the professional standard of care, and this was not done in this case.
The key question before us is whether or not Dr. Byars conformed to the national standard of care dealing with informed consent for the insertion of an IUD in October of 1975. The record does not reflect that the Marshalls showed, through expert testimony or otherwise, what standard of care Dr. Byars was held to when dealing with the insertion of IUDs and the risks involved. Without knowledge of what the standard of care is, we can not say that Dr. Byars breached it.
There are four elements that must be shown by the plaintiff to prove negligence: (1) the standard of care; (2) a breach of that standard on the part of the defendant; (3) proximate cause; and (4) damages. In this case, as no standard of care was shown, we need not address the other three elements.
On the question of a directed verdict, we said most recently in Clayton v. Thompson, 475 So.2d 439 (Miss. 1985):
In determining whether to grant a directed verdict, "the Court must look solely to the testimony in behalf of the party against whom the directed verdict is requested and consider that testimony as true along with all inferences which could be drawn therefrom favorable to such party, and if such evidence could support a verdict for him, the directed verdict or peremptory instruction should not be given." [citations omitted].
445 So.2d at 443.
There is no merit to the first assignment of error, and there was no abuse by the trial judge in granting the motion for directed verdict.
In summary, the trial court properly granted a directed verdict in favor of the defendant since the plaintiffs failed to establish a primary element of negligence, namely the standard of care. As this is the case, the remaining assignments of error need not be addressed.
DIRECTED VERDICT IN FAVOR OF DEFENDANT AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
ANDERSON and HAWKINS, JJ., dissent.
ANDERSON, Justice, dissenting:
Because I believe that the majority's position effectively extracts some teeth from our informed consent requirement, I must respectfully dissent.
This case involves a doctor who gave his patient an I.U.D. and told her to notify him if certain symptoms appeared after it was inserted. The majority appear to believe that this generalized advice discharged his duty to warn, even though he made no mention of the specific dangers associated with this particular treatment  ectopic pregnancy, blockage of the fallopian tubes, and ovarian cysts.
In the present case, the doctor told the patient to contact him if she experienced "excessive bleeding, abdominal pain, nausea, *866 dizziness or fever." That is all well and good, but presumably he would have given those warnings upon dispensing any I.U.D. If specific dangers associated with the CU-7 were known among physicians, then I believe that Dr. Byars had a duty to warn of them, and further that that duty was not discharged by the mere recitation of routine cautionary instructions. The point of having an informed consent rule in the first place is to insure that "the patient will be in a position to make an intelligent decision as to whether he will submit to such treatment or surgery." Ross v. Hodges, 234 So.2d 905, 908 (Miss. 1970). It can hardly be doubted that the dangers of the CU-7, if disclosed, would have affected the Marshalls' decision to accept or reject it.
If a man proposed to take an excursion on the Niagara River in a small rowboat, and a tour guide warned him to wear a life-jacket and to refrain from standing in the bow, the sailor would have been informed of some real dangers; yet the warning as given would be somewhat incomplete.
The majority seem to confuse the duty to warn with the duty to adhere to the standard of substantive care. Actually, the two are independent. Even if a given treatment objectively met the standard of care, a patient would still have the right to reject it, but he could not intelligently do so unless he were informed of any disadvantages.
The Marshalls adduce two out-of-state cases to support their contention that expert testimony is not required to prove breach of a physician's duty to warn. Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (1960); Calabrese v. Trenton State College, 162 N.J. Super. 145, 392 A.2d 600 (1978), aff'd 82 N.J. 321, 413 A.2d 315 (1980). The majority's efforts to distinguish these cases leave me unpersuaded.
First, it is noted that "Mrs. Marshall fainted while on birth control pills and switched doctors to have an I.U.D." How this circumstance exculpates Dr. Byars is beyond me. If anything, it ought to have put him on notice that Mrs. Marshall was an unusually sensitive patient, for whom more than the usual precautions were advisable.
Second, it is said that "when the CU-7 was inserted ... Dr. Byars cautioned her about excessive bleeding, abdominal pain, nausea, dizziness or fever, and cautioned her to call him if any of the above events occurred." As noted previously, these are routine instructions which would be given to a patient receiving any I.U.D. They do not speak to the specific problems associated with the CU-7, nor do they even hint at the gravity of possible harms. Dr. Byars' instructions on how to check the I.U.D. string are of the same general nature.
In recent years the law of tort has greatly expanded the individual's protection from medical misfortunes. The informed consent doctrine in particular has enabled medical patients to reassert their control over decisions vital to their well-being. Today's decision may operate to deprive patients of knowledge necessary to the control of their destinies. It is, in short, a step backwards and I therefore dissent.
HAWKINS, J., joins in this dissent.