495 So.2d 453 (1986)
Kathryn Deborah LATHAM
v.
Dr. Thomas William HAYES, M.D. and Dr. Myron W. Lockey, M.D.
No. 55769.
Supreme Court of Mississippi.
September 24, 1986.
Rehearing Denied October 29, 1986.
*454 Jim Brantley, Paul Snow, Jackson, for appellant.
C.R. Montgomery, Montgomery, Smith-Vaniz & McGraw, Edward Ellington, Thomas A. Bell, Larry D. Moffett, Daniel, Coker, Horton & Bell, Jackson, for appellees.
En Banc.
GRIFFIN, Justice, for the Court:
This medical malpractice case comes to the Court from the Circuit Court of the First Judicial District of Hinds County, *455 Mississippi. At the conclusion of the plaintiff's case-in-chief, the trial court granted a directed verdict for the defendants. We affirm.
In the Spring of 1975, Kathryn Latham began to experience problems with her left ear. It drained a malodorous, yellowish pus, to which she applied alcohol. During the Summer, she also suffered from dizziness, and at this point decided to seek professional medical care. As an employee of the University Medical Center, she visited the Employee's Health Clinic; it, in turn, referred her to the Medical Center's E.N.T. Clinic. A doctor at the E.N.T. Clinic, conducted a hearing test and ordered x-rays, determining as a result that Latham had a "dead ear". Moreover, ear trouble was nothing new to Latham; during her youth, she had polyps removed on three occasions, and developed "swimmer's ear" annually.
On the initial examination, doctors also determined that the left ear again contained polyps. On several occasions thereafter the doctors attempted to remove the polyps at the Clinic, but the procedure was unsuccessful. Dr. Myron Lockey, a defendant, whom Latham called as an adverse witness, testified that on August 11, both he and Dr. Thomas Hayes, the other defendant, informed Latham that she had a "serious problem", which required her admission to the hospital. At trial, Latham denied that either doctor had made such a statement to her; rather, she knew only that the doctors were going to remove the polyps in what she believed to be a "simple operation". In addition, although she had signed a consent form for the surgery, she testified that no one had advised her either of the procedure involved or of the risk to the seventh cranial nerve, which controls the muscles of the face. She did state, however, that the doctors had told her that the polyps were large, and needed to be removed.
On August 19, 1975, Drs. Hayes and Mokhtari, who were then in their third and first years of E.N.T. residency, respectively, operated on Latham. (Service of process failed on Dr. Mokhtari; after his residency, he returned to Iran). Dr. Lockey was also present, periodically, during the operation in his capacity as professor of otolaryngology (ear, nose and throat). During surgery, whose field was behind the ear and not through the ear canal itself, Drs. Hayes and Mokhtari discovered a cholesteatoma, the growth of which had created a direct opening to the brain, a life-threatening situation. In removing the cholesteatoma, the adjacent seventh cranial nerve was damaged, which paralyzed the left side of Latham's face. As a result of this permanent injury, Latham has undergone numerous operations, conducted by a plastic surgeon.
On these facts, the plaintiff alleges various errors in the trial of the case. At trial, Latham relied upon the testimony of Dr. Lockey, in his capacity as an expert in the field of otolaryngology, to establish the standards for informed consent and duty of care in Jackson, Mississippi, on August 19, 1975. Otherwise, Latham was unable to procure an expert witness in the treatment of ear, nose and throat disorders.
Latham assigns error to the rulings of the trial court, which repeatedly sustained the defense's objections to the content of Latham's hypothetical questions. Latham argues that the trial court, in effect, required her to include in her hypotheticals to Dr. Lockey all of the facts which had thus far been introduced into evidence, though some of these facts were in conflict. Consequently, Latham contends that the witness invaded the province of the jury by sorting through the conflicting evidence, using his own judgment, to produce his answers.
The following exchanges reflect the basis for the appellant's contention:
Q My question is, did the proper standard of care of ENT surgeons in August, 1975, in Jackson, Mississippi, concerning informed consent require that doctor to fully inform that patient of the risks of the operation? Is that true?
A ... I acknowledge that it is proper for an ear, nose and throat doctor in *456 Jackson during that time to tell the patient what they suspected, what they plan to do and that the facial nerve comes through the ear and that you are going to make every effort not to damage it.
Q Now I want you to assume that the ENT doctor on that date of August 18, 1975, in Jackson, Mississippi, failed to mention the nerve. I want you to assume those facts to be true, understand?
A I do understand what you are saying, yes.
Q Assuming those facts to be true, would your opinion be, then, that if that doctor failed to do that, he would have violated the standard concerning informed consent in Jackson, Mississippi, on August 18, 1975?
At this point, both defendants objected; the court sustained the objections, stating that hypothetical questions required all of the facts. The plaintiff continued:
Q Dr. Lockey, assume that a patient who went into the clinic about August of 1975 had a diagnosis of otitis media like she did in this case, and assume that when the time came for the doctor to inform the patient of the operation and procedure and the risks, assume that the only thing that the doctor mentioned was, "We are going to remove your polyps," and assume that nothing was said about the disease they thought she had and nothing was said about the procedure of the left tympanomastoidectomy; nothing was said about the nerve. Now, assuming all those facts to be true, what is your opinion concerning whether or not the ENT doctor on that date breached the standard of care concerning informed consent in Jackson, Mississippi?
Again, the defendants objected to the incomplete nature of the hypothetical, and the court sustained the objection. the plaintiff then asked:
Q All right, let me ask the same question. Assume that even though she signed the consent form, it was blank at the time she signed it and nobody mentioned the word, left tympanomastoidectomy; assume that no one told her they were going to do a tympanomastoidectomy; assume those facts to be true, what would your opinion be regarding violation of the consent?
Again, the court sustained an objection on the same ground. Then the plaintiff offered more facts on which to predicate his question regarding the standard of informed consent:
Q Let me ask you to assume further that all the doctor did at the time was say, "All we are going to do is remove your polyps"; assume further that the patient did know what the polyp removal operation entailed and that all she understood was the polyp removal operation; assume that the doctor did not tell her anything about a cholesteatoma; assume that the doctor did not tell her anything about a tumor; assume that the doctor did not ever tell her that her facial nerve might be damaged and injured for the rest of her life; assume that the doctor did not say that it would be a serious operation  just a serious polyp removal; assume further that if the doctor did tell her it was a left tympanomastoidectomy, the patient would not have allowed the doctor to do the operation; assume further that if the doctor did tell her it would be a serious tympanomastoidectomy, she would have found a qualified doctor who would not cut a nerve during the operation; assuming those facts to be true, what would be your opinion regarding the standard?
At this juncture, defense counsel objected, arguing for the inclusion of the plaintiff's medical records, the plaintiff's previous testimony, and the witness's previous testimony into the question. Although the court sustained the objection only as to the witness's previous testimony, the plaintiff then asked:

*457 Q Assuming that all the medical records that have been introduced in evidence and assuming all your previous testimony concerning informed consent and assuming all of the facts regarding Kathy Latham's testimony to be true ... assuming all that to be true, Doctor, what is your opinion?
A Assuming that everything involved that I've heard so far, this patient was informed.
Significantly, just prior to this final exchange between the plaintiff's counsel and Dr. Lockey, Dr. Lockey said: "I am totally confused. You make an assumption and you come along and say `further assuming' and `further assuming'  are we still keeping the original  I am lost." Obviously, the piecemeal fashion by which the plaintiff had phrased the hypothetical in an attempt to satisfy the defense's proper objections served only to obscure the factual basis of the hypothetical for the expert witness.
The law concerning the content of hypothetical questions posed to an expert witness at trial is well settled in Mississippi. Where facts are disputed, a party may state those facts consistent with his theory of the case in a hypothetical question; yet, the question may not omit material, undisputed facts. Strickland v. M.H. McMath Gin, Inc., 457 So.2d 925, 928 (Miss. 1984), Magnolia Hospital v. Moore, 320 So.2d 793, 799 (Miss. 1975). The trial court enjoys a wide discretion in permitting or rejecting a hypothetical question, particularly with regard to whether it encompasses the facts in evidence. Cadillac Corporation v. Moore, 320 So.2d 361, 366 (Miss. 1975). In addition, the trial court's discretion is not to be overridden, absent a clear showing that such discretion has been "wrongfully exercised." Providence Washington Insurance Co. v. Weaver, 242 Miss. 141, 153, 133 So.2d 635, 640 (1961).
In this case, there was no abuse of discretion by the trial court. Although the plaintiff certainly had the right to question Dr. Lockey, based upon her own view of the disputed facts, such questions required the inclusion of all material, undisputed facts, as well. In short, no question asked by the plaintiff satisfied this basic requirement for hypothetical questions, propounded to an expert witness. For example, there was no mention of Latham's previous medical history, including attempts to correct the disorder without surgery, nor of the scope of consent provided for in the consent form.
The appellant also submits that the trial court improperly granted a directed verdict, since there was a question of fact for the jury to decide. Unquestionably, the evidence shows that the nerve was damaged during the operation, resulting in paralysis. This alone is insufficient, however, to prove negligence.
The standards to review a directed verdict for the defendant require the trial court to consider the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences derived therefrom. Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985). See also, Hardy v. Brantley, 471 So.2d 358 (Miss. 1985), Hall v. Hilbun, 466 So.2d 856, 880 (Miss. 1985), Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983). In Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971), a medical malpractice case, the Court stated:
Viewing the evidence in the light most favorable to plaintiff, the most that plaintiff proved was that an undesired and bad result ensued following the operation. This is not the equivalent of proving negligence in this kind of case. The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice; and a physician is not a warrantor against bad results. Negligence must be shown. (citation omitted)
Here, the appellant's sole expert witness was Dr. Lockey, who did not state, either directly or by inference, that the surgical procedure employed by the doctors involved negligence. At no point did Dr. Lockey equate damage to the nerve with negligence, stating rather that the surgeon should make every effort not to cause injury, adding significantly, "[Y]ou can't guarantee *458 that it won't be cut." In short, the appellant failed to offer any testimony showing a want of ordinary care and skill.
A related issue concerns the grant of a directed verdict on the issue of informed consent. To recover, a plaintiff must show that the doctor failed to disclose sufficient information about the proposed operation to constitute informed consent. Ross v. Hodges, 234 So.2d 905, 909 (Miss. 1970). Such information must include the known risks of a procedure, which would be material to a prudent patient in determining whether or not to undergo suggested treatment. There must also be a causal connection between the breach of the duty by the defendant and the injuries to the plaintiff. To determine the existence of a causal connection, the question is whether a reasonably prudent patient, fully advised of the material known risks, would have consented to the treatment. Reikes v. Martin, 471 So.2d 385, 392 (Miss. 1985).
The plaintiff has the burden of proof to establish the professional standards of the medical profession for informed consent. Ross, supra. In this case, Dr. Lockey testified that the standard of care for informed consent required Dr. Hayes to tell Latham that a nerve, controlling the muscles in her face, ran through the ear and that every effort would be made not to damage the nerve. Latham vigorously denies that she was told anything about the nerve.
Despite this evidence, the trial court properly directed a verdict for the defendant on the issue of informed consent. Latham makes no showing that there exists any causal connection between the lack of information and the injury. Using the objective standards set out in Reikes, supra, there is no indication that a reasonable, prudent patient, having been fully advised of the material, known risks, would have refused to undergo the surgery. Not only was it known that the ear drained an obnoxious fluid, contained polyps, and upset the patient's balance, but during the operation it was also found to contain a cholesteatoma, such as to pose a life-threatening situation.
The appellant also asserts that the trial court wrongly excluded from evidence the deposition of an expert witness, who was not found when subpoenaed for trial. At the trial, Latham attempted to introduce a part of the deposition, at which time counsel for Dr. Hayes objected, seeking the admission of the entire deposition. The court sustained the objection. Thereafter, the deposition was marked for identification, but no part of it was offered into evidence.
Mississippi Code Annotated § 13-1-232(1)(4) (Supp. 1985), states in part:
If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts.
See also, Belesky v. City of Biloxi, 412 So.2d 230, 234 (Miss. 1981). The objection was properly sustained. Also, the appellant made no effort to introduce any part of the deposition following the objection. There was no showing as to what parts of the deposition the appellant sought to place into evidence. Moreover, since the deposition was of Dr. Michael Jabaley, the plastic surgeon who worked with Latham after the operation at issue, and concerned primarily the injuries involved and not the duty upon the defendants nor the alleged breach thereof, the refusal of the trial court to admit the deposition as requested, had no effect upon the outcome of the case.
The appellant alleges that the trial court's failure to apply the doctrine of res ipsa loquitur constituted reversible error, as well. Yet, this case is not one in which the doctrine applies. Res ipsa loquitur requires a finding that (1) the instrumentality causing the injury was under the control and management of the defendant and (2) the occurrence resulting in the injury does not happen in the ordinary course of events, where due care has been exercised. Waddle v. Sutherland, 156 Miss. 540, 549-50, 126 So. 201, 203 (1929). See also, Fisher *459 v. Daniels, 252 Miss. 662, 173 So.2d 908 (1965); Peerless Supply Co. v. Jeter, 218 Miss. 61, 65 So.2d 240 (1953). Yet, Dr. Lockey, testifying as an expert, did not equate severance of the nerve with negligence, stating: "You do what you can to protect and avoid cutting the nerve. That is the standard of care, but you can't guarantee that it won't be cut."
A jury may not presume negligence because of the untoward results of surgery. Ross, at 909. Rather, the use of res ipsa loquitur should be cautiously applied. J.C. Penney Co. v. Evans, 172 Miss. 900, 160 So. 779 (1935). In Sanders v. Smith, 200 Miss. 551, 561, 27 So.2d 889, 893 (1946), the Court outlined its use:
The real question, generally, is whether or not in the process of the operation any extraordinary incident or unusual event, outside of the routine of the action of its performance, occurred, and beyond the regular scope of its customary professional activity in such operations, which, if unexplained, would themselves reasonably speak to the average man as the negligent cause or causes of the untoward consequence.
See also, DeLaughter v. Womack, 250 Miss. 190, 211, 164 So.2d 762, 771 (1964).
An injury to the seventh cranial nerve is not an "extraordinary incident or unusual event" in an operation such as this. Appellant's attempt to prove that mention of the nerve was required in order to give an informed consent demonstrates this point. Also, this is not a case involving an injury to a part of the body wholly outside of the surgical field. Palmer v. Clarksdale Hospital, 206 Miss. 680, 40 So.2d 582 (1949). Here, the nerve ran through the surgical field. Consequently, there was no error.
Next, the appellant seeks a reversal, alleging that the trial court required the plaintiff to prove more than the standard of care applicable and a deviation therefrom. Specifically, Latham argues that the plaintiff in such a case need not present expert testimony that the defendant in fact violated the standard of care.
Mississippi authority holds otherwise. In Dazet, supra, the Court stated, "Negligence cannot be shown in this type of case absent expert medical testimony that defendants failed in some particular respect to use ordinary care and skill, unless the matter in issue is within the common knowledge of laymen." Dazet at 187. See also, Kilpatrick v. Mississippi Baptist Hospital, 461 So.2d 765 (Miss. 1984); Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985).
There was no such showing here. At trial, defense counsel asked Dr. Lockey the following:
Q In your opinion, was there any deviation whatsoever or violation of any standard of care concerning such an operation by any of the doctors involved in this case?
A No, sir, none whatsoever.
In addition, the fact that the nerve was damaged during the operation does not, of itself, imply negligence. Another exchange, this time between plaintiff's counsel and Dr. Lockey, illustrates the point:
Q [D]oes the standard of care of ENT doctors on August 19, 1975, in Jackson, Mississippi, require that the surgeon not injure or damage the patient during the operation?
A The standard of care, ..., dictates that the surgeon or the operating physician will do everything within his power to properly treat and care for that patient. There are situations in which events happen which you have absolutely no control over and the standard of care is that you will make every prudent effort to avoid these situations.
Q And the standard requires that you do everything in your power not to cut the nerve?
A That is true. You do what you can to protect and avoid cutting the nerve. That is the standard of care but you can't guarantee that it won't be cut. (emphasis added)
*460 The record fails to disclose any expert testimony to the effect that the defendants breached the standard of care. In fact, upon questioning, the plaintiff's expert witness stated that the standard of care had not been breached. Under Dazet then, the plaintiff failed to make the required showing.
The appellant's remaining assignments of error require only brief mention. First, without citing a single authority, the appellant contends that the case should be remanded for a new trial because the appellees failed to file their final judgment before the term of court closed, in fact filing it at the next term of court. Mississippi Code Annotated § 11-1-16 (Supp. 1985), states:
(1) Notwithstanding the provisions of any other law to the contrary, the judge of any circuit, chancery, county, youth or family court or any other court of record shall, in vacation, and in the same manner as at a regular term, have jurisdiction to hear and determine and make and enter judgments, orders and decrees in all cases, civil or criminal, which are pending in the court and which were triable at the preceding term. (emphasis added)
Implicit is the ability to enter judgment in a subsequent regular term as well as in vacation. Gray v. Thomas. 12 S. & M. 111 (Miss. 1849).
Also, the appellant argues that the trial court required, incorrectly, expert testimony on matters within the common knowledge of the jury, namely that the appellant failed to receive sufficient information on which to base an informed consent, that the appellant's cranial nerve was severed during the operation, and that Dr. Lockey walked out during the most important part of a complicated and serious operation. All three matters manifestly involve factors beyond the common knowledge of a lay jury.
Finally, the appellant urges the abolition of the locality rule for expert witnesses. Subsequent to the filing of this appeal, the Court decided Hall, supra, which effectively accomplished that result. Yet, to base a reversal on this ground is impossible, since the plaintiff failed to offer any expert, concerning a local or national standard of care, except for Dr. Lockey. There is no error where the trial court admitted the sole expert witness, tendered by the appellant.
For the reasons stated, the verdict of the trial court is affirmed.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, J., concur.
ANDERSON, PRATHER, ROBERTSON and SULLIVAN, JJ., dissent.
ANDERSON, Justice, dissenting:
This appeal makes it necessary to remind ourselves of one of the more unpleasant truths of our profession: human beings are under no legal duty to feel gratitude.
The plaintiff in this case has suffered a serious injury, but for redress she is suing the very doctors who most probably saved her life. Her position is, to use the kindest possible expression, morally unattractive. Nevertheless, as judges we should not allow our normal human responses to the basic meanness of this action to keep us from seeing that she has a good deal of law on her side.
I have no quarrel with the majority's exposition of the general principles of our doctrine of informed consent. But in applying those principles to the facts of this case, it seems to me that they have grafted an alien branch onto the healthy trunk of the doctrine. What worries me specifically is the portion of the opinion here reproduced.
Using the objective standards set out in Reikes, supra, there is no indication that a reasonable, prudent patient, having been fully advised of the material, known risks, would have refused to undergo the surgery. Not only was it known that the ear drained an obnoxious *461 fluid, contained, polyps, and upset the patient's balance, but during the operation it was also found to contain a cholesteatoma, such as to pose a life-threatening situation. (Emphasis added).
The problem here is obvious. The existence of the cholesteatoma, and consequently any damages resulting from the failure to remove it, were not "known risks" for purposes of our informed consent rule. The cholesteatoma was not discovered until the surgery itself  well after Mrs. Latham gave her consent.
The cases on informed consent firmly establish that discussion of risks must focus on those dangers which are either known or discoverable by due diligence at the time of the consent. So far as I can discover, we are now the first state to give either the doctor or the patient the benefit of hindsight in evaluating the validity of the consent.
There are numerous cases holding that a doctor is not liable for failing to warn a patient of risks flowing from an unknown and unknowable condition. See, e.g. Truman v. Thomas, 27 Cal.3d 285, 291, 611 P.2d 902, 905, 165 Cal. Rptr. 308, 311 (1980) (physician bound to disclose all information he "knows or should know" would be considered significant); Woolley v. Henderson, 418 A.2d 1123, 1129 (Me. 1980) (no liability for failure to disclose risk that "subsequently materialized"); Sard v. Hardy, 281 Md. 432, 379 A.2d 1014, 1022 (1977) (duty to disclose arises only where doctor "knows or ought to know" of risk); Cornfeldt v. Tongen, 262 N.W.2d 684, 699 (Minn. 1977) (no liability for failure to disclose if doctor "did not know of risk and had no duty to know of it.").
I could find no other case in which a doctor argued that the subsequent discovery of a previously unknown condition could breathe life into an otherwise invalid consent. The logic of the existing cases militates against such a rule. Common sense tells us that facts that were neither known nor knowable could have had nothing to do with Mrs. Latham's consent one way or the other.
Without the cholesteatoma, the case that Mrs. Latham's consent was truly informed is very weak. In order to justify the directed verdict, the majority must speak solely of the obnoxious drainage and the balance problem. These are serious evils, but can we truly say, as a matter of law, that no reasonable person would choose to live with them rather than risk paralysis from a damaged nerve? It seems to me that a jury issue was made out on the point.
Most people delivered from death would probably not complain about a lesser injury incidentally inflicted by their saviors. This plaintiff chose otherwise. Few will mourn her defeat; no more shall I. But because the majority seems to be laying down a rule which could cause serious trouble later on, I must respectfully and reluctantly dissent.
PRATHER, ROBERTSON and SULLIVAN, JJ., join in this dissent.