# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00483-SCT

*TAMMY WINTERS AND DAVID WINTERS*

*v.*

*BENNIE B. WRIGHT, JR., M.D., CLEVELAND CLINIC, P.A., AND BOLIVAR COUNTY MEDICAL CENTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/30/1999 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT W. SMITH |
| | JUDY M. GUICE |
| ATTORNEYS FOR APPELLEES: | P. SCOTT PHILLIPS |
| | L. CARL HAGWOOD |
| | LEE DAVIS THAMES, JR. |
| | R. E. PARKER, JR. |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 09/11/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Tammy Winters ("Tammy") and her husband, David Winters ("David"), filed a complaint

in Bolivar County Circuit Court against Dr. Bennie B. Wright, Jr. ("Wright") and his employer,

Cleveland Clinic, P.A., Bolivar County Hospital ("BCH"), and Cincinnati Sub-Zero Products,

Inc. ("Sub-Zero") on December 8, 1995. Tammy's claim arose from an injury to her buttocks

and thighs that she claims was caused by a Sub-Zero heating blanket utilized during surgery

performed on her by Wright at BCH.  Prior to trial, plaintiffs settled their claim against Sub-

Zero. Trial with the remaining defendants commenced on January 11, 1999, and ended on January 20, 1999. The jury found in favor of all three remaining defendants, and judgment was entered on February 1, 1999. On February 19, 1999, the trial judge denied the plaintiffs' motion for new trial and judgment notwithstanding the verdict.

**FACTS**

¶2. Tammy was out with two friends shooting at cans on the bridge over the Quiver River in Sunflower County late on the evening of December 12, 1994. Somehow, while reloading her .380 caliber pistol, Tammy accidentally shot herself in the abdomen. Her friends managed to load her into a vehicle and get her to the North Sunflower County Hospital in Ruleville, Mississippi. The facility was not equipped to treat Tammy, and thus an ambulance took her from there to BCH. Upon arrival at BCH, Tammy was taken to the emergency room. Wright, who was not on duty that night, had been called in by the emergency room physician to care for Tammy. Upon Wright's arrival, Tammy had coded, but had been resuscitated by the emergency room physician. Once she had been resuscitated, Wright ordered the nurses to give her 4,000 cc's of fluid, which is four times the amount normally given to a patient in eight hours. Further, in order to keep Tammy alive, he ordered that she be given uncross-matched blood.

¶3. The bullet had entered her left side beneath her ribs and exited out the lower part of her back causing multiple injuries. Wright then accompanied Tammy to the operating room. Once there, he left to change into scrubs and prep for surgery. While he was out, staff moved Tammy from the gurney to the operating table. Glenda Morton, an operating technician that evening, testified that when Tammy was transferred from the gurney to the table that she noted that her backside was blue. She asked Wright about this, and he informed her that Tammy was bleeding

2

out and the blood was pooling in her back. Under Tammy, on the operating table, was a sterile operating sheet. Under that, was the Blanketrol II blanket manufactured by Sub-Zero. This blanket is attached to a unit which circulates water throughout the blanket. Water is heated or cooled and pumped from the unit to the blanket. The person operating the machine sets the desired temperature of the patient, and the machine pumps the water through the blanket accordingly to regulate the patient's temperature. The unit stands thirty-six inches tall and is seventeen inches wide.

¶4.     Christy Tolbert, the circulating nurse on the evening of Tammy's surgery, testified that she turned on the Blanketrol unit that evening and that it was set at 98.6 degrees Fahrenheit. She also testified that she checked the temperature periodically throughout the surgery and that she never saw it go above the original set point. Upon cross-examination, Tolbert did note that during her deposition she had stated that she did not check the machine every twenty minutes, as suggested by the unit's manual. Once Wright returned to the operating room, Tammy was on the operating table, and the nurse anesthetist, Paul Rayfield, had hooked up his monitors and put Tammy to sleep. Wright then draped Tammy for surgery and began the operation. Wright testified that when he made the initial incision blood spouted from Tammy's abdomen and he had to clamp her aorta to stop the blood loss. This clamping cut off the blood supply to the stomach, liver, small intestine, pancreas, kidneys, uterus, legs, buttocks and spleen. Once some of the blood was cleared out of her abdominal cavity, Wright moved the clamp lower to get blood to her vital organs, but it was still cut off to the lower portion of her body. Following the operation, two operating technicians and a nurse noticed the imprint of the blanket on her backside and that her buttocks were discolored. Those personnel that had physical contact with

3

Tammy prior to, during and following surgery all testified that her skin was not warm to the touch. Further, the nurse anesthetist testified that he monitored her temperature during surgery and that it was never above normal.

¶5. Due to problems Tammy suffered to her lower extremities due to insufficient blood circulation, Wright consulted with Dr. Rodney Frothingham, a neurosurgeon, and Dr. Hugh Gamble, a vascular surgeon. After Tammy was transferred to Delta Regional Medical Center in Greenville, Mississippi, Wright spoke with Gamble to tell him what problems Tammy might have. Gamble mentioned that there was something wrong with Tammy's buttocks. In Wright's opinion the injuries to Tammy's buttocks are the result of the constriction of blood flow back to her buttocks. When her aorta was clamped, blood flow to her buttocks was cut off. He testified that when this occurs, oxygen does not get to the tissue and the tissue dies. He further testified that this is why Tammy lost some of her toes. The staff and physicians that treated Tammy's injury to her buttocks referred to the injury as a burn. In early treatment notes, however, it is clear that no one was certain it was a burn. Dr. Robert Love, a plastic surgeon at Delta Regional Medical Center, noted the following in regard to Tammy's injury, "I cannot confirm or deny the etiology of this lesion. It certainly has the appearance of a burn, although it is hyperemic." According to Wright's testimony, hyperemic means that it was full of blood.

¶6. Tammy went through multiple skin grafts and treatment at various hospitals due to this injury. Tammy and David brought suit against Wright, Cleveland Clinic, BCH, and Sub-Zero, claiming they were responsible for her injuries and that she had been burned by the heating blanket utilized during her surgery. Following a jury verdict for the defendants, entry of

4

judgment in accordance with that verdict and a denial of plaintiffs' motion for a new trial or a judgment notwithstanding the verdict, Tammy and David appeal to this Court.

## STANDARD OF REVIEW

¶7.    Our standard for review is de novo in passing on questions of law. *Miss. Farm Bureau Cas. Ins. Co. v. Curtis*, 678 So.2d 983, 987 (Miss. 1996); *Seymour v. Brunswick Corp.*, 655 So.2d 892, 895 (Miss. 1995).  In reviewing the denial of a judgment notwithstanding the verdict, peremptory instruction, and directed verdict,

> This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Steele v. Inn of Vicksburg, Inc.*, 697 So.2d 373, 376 (Miss. 1997). This Court will reverse a trial court's denial of a request for new trial only when the denial amounts to an abuse of discretion. *Id.* (citing *Shields v. Easterling*, 676 So.2d 293, 298 (Miss. 1996)).

> The standard of review for challenges to jury instructions is as follows:
> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Austin v. State*, 784 So.2d 186, 192 (Miss. 2001) (quoting *Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000)).

¶8.    This Court will consider a trial judge's decision to admit evidence and whether an expert witness is qualified to testify under an abuse of discretion standard. See *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d 149, 152 (Miss. 1997); *May v. State*, 524 So.2d 957, 963 (Miss. 1988).

## DISCUSSION

¶9.    The plaintiffs raise multiple issues on appeal. First, they argue that the trial judge erred in denying their request for a res ipsa loquitur instruction. Second, they contend that the trial judge erred in refusing to allow their expert, Dr. Robert Tucker, to testify regarding the standard of care in the use of the heating blanket. Third, they allege the trial court erred by giving conflicting instructions regarding Wright's vicarious liability for actions of the operating room personnel. Fourth, they maintain that it was error for the trial judge to refuse their request for a peremptory instruction regarding the heating blanket. Fifth, they assert error by the trial court in allowing the defendants to pose leading questions to witnesses called by one another. Finally, they charge that it was error for the trial judge to exclude testimony regarding Wright's control of the operating room.

¶10.    BCH raises two issues on cross-appeal. First, it alleges that the trial judge erred in not extending the scheduling order following a change in counsel for BCH after its insurer declared bankruptcy. Second, BCH contends that the trial judge erred in granting a motion in limine to exclude evidence of Tammy's consumption of alcohol the night of her injury.

## I.    WHETHER THE TRIAL JUDGE ERRED IN REFUSING TO GRANT A RES IPSA LOQUITUR JURY INSTRUCTION.

¶11.    Plaintiffs' requested jury instruction P-3 states:

The Court instructs the jury that under certain circumstances an accident speaks for itself and a presumption of negligence arises. In such cases, the plaintiffs need not allege or prove the particular act of negligence itself which caused the injury but the burden is on the defendants to show an absence of negligence.

The conditions which must occur before this presumption of negligence arises are as follows:

1.   the event must be one that would not normally occur absent someone's negligence;

2.   the event must be caused by an agent or instrumentality within the defendant or defendants exclusive control; and,

3.   the plaintiff must not have voluntarily contributed to the event.

This presumption of negligence permits but does not compel the jury to find for the plaintiff.

Accordingly, if you find from a preponderance of the evidence that the above factors are present then there is a presumption of negligence in this case. If you further find that the Defendant or Defendants have not met their burden to show an absence of negligence and that the negligence proximately caused injury to the Plaintiff then you must find for the Plaintiff.

Plaintiffs argue that the trial judge erred in denying this instruction.

¶12.   Res ipsa loquitur is a rule of evidence that allows negligence to be inferred in certain fact situations. *Waddle v. Sutherland*, 156 Miss. 540, 549-50, 126 So. 201, 203 (1930). The doctrine of res ipsa loquitur is applicable to medical malpractice cases. *Id*. This Court has stated that the "general rule is that medical negligence may be established only by expert medical testimony, with an exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience." *Coleman v. Rice*, 706 So. 2d 696, 698 (Miss. 1997) (quoting *Erby v. North Miss. Med. Ctr.*, 654 So. 2d 495, 500 (Miss. 1995)). As this Court has noted,

A jury may not presume negligence because of the untoward results of surgery. *Ross v. Hodges*, 234 So.2d 905, 909 (Miss.1970). Rather, the use of res ipsa loquitur should be cautiously applied. *J.C. Penney Co. v. Evans*, 172 Miss. 900, 160 So. 779 (1935). In *Sanders v. Smith*, 200 Miss. 551, 561, 27 So.2d 889, 893 (1946), the Court outlined its use:

> The real question, generally, is whether or not in the process of the operation any extraordinary incident or unusual event, outside of the routine of the action of its performance, occurred, and beyond the regular scope of its customary professional activity in such operations, which, if unexplained, would themselves reasonably speak to the average man as the negligent cause or causes of the untoward consequence.

*See also Latham v. Hayes*, 495 So.2d 453, 459 (Miss. 1986); *DeLaughter v. Womack*, 250 Miss. 190, 211, 164 So.2d 762, 771 (1964).

¶13.    With these principles in mind, the doctrine of res ipsa loquitur requires three things. First, the instrumentality causing the injury must be under the control and management of the defendant(s). *Coleman*, 706 So. 2d at 698.   Second, the injury must be such that in the ordinary course of things it would not occur if those in control of the instrumentality used proper care. *Id*.  Finally, the injury must not be due to any voluntary act by the plaintiff. *Id*.

¶14.    Wright makes two arguments as to why res ipsa loquitur should not apply in the instant case.  First, he contends that Tammy did not prove the blanket caused her injury, and thus she was not entitled to a res ipsa loquitur instruction.  Alternatively, he argues that Tammy failed to prove that he had exclusive control over the blanket.  BCH argues that a res ipsa loquitur instruction was inappropriate because an alternate theory for Tammy's injuries was offered. BCH argues further that even if a res ipsa loquitur instruction were appropriate, it is not reversible error for the trial judge to have denied it.  BCH argues that Instruction P-6 cured any error.  Instruction P-6 states in part:

[BCH]... allowed Plaintiff to be burned while she was unconscious and totally dependent on their care. If you find from a preponderance of the evidence that [BCH] was negligent in rendering or failing to care to the Plaintiff and if you should further find that such negligence was a proximate contributing cause to Plaintiff's injuries, then it is your sworn duty to find in favor of the Plaintiff and against [BCH].

¶15.    We find that Tammy was not entitled to a res ipsa loquitur instruction. This Court has noted the limits of the doctrine of res ipsa loquitur:

That doctrine (1) has no operation to excuse or dispense with definite proof, by the plaintiff, of material facts which are tangible and are capable of direct and specific evidence, as much within the power of plaintiff to produce as of the defendant; and (2) it is available to establish negligence on the part of the defendant only when the accident is such that, according to ordinary human experience, it could not have happened without such negligence; from which it follows that the doctrine does not apply when, upon the whole case, there has been specific proof which discloses some reasonable explanation for the happening other than the negligence charged against the defendant.

*Yazoo & M.V.R. Co. v. Skaggs*, 181 Miss. 150, 179 So. 274, 277 (1938). While it is true that Tammy was asleep during surgery and has no ability to state conclusively what occurred while she was unconscious, she is capable of having an expert testify as to whether the injury on her backside was the result of a burn or dead tissue, and in fact, Tammy offered such expert testimony that the tissue was burned due to the heating pad. Alternatively, Wright testified as to his contention that the injury suffered by Tammy was dead tissue resulting from loss of blood circulation. When both sides to a dispute have put forth evidence, we find that the issue is a fact question for the jury, and thus a res ipsa loquitur instruction is inappropriate.

¶16.    This issue is quite similar to the question presented to this Court in *DeLaughter v. Womack*, 250 Miss. 190, 164 So. 2d 762 (1964) *overruled on other grounds by Hall v. Hilbun*, 466 So.2d 856 (Miss. 1985). In *DeLaughter*, a young boy had been given a penicillin

9

shot by a nurse, as instructed by the doctor. 250 Miss. at 197, 164 So. 2d at 764. The child reported back with various problems over the next two days, and the doctors were unable to definitively diagnose the problem. Ultimately, the boy lost his toes and skin off of his foot and lower leg. *Id*. The boy filed suit alleging that the nurse was negligent in giving the injection, resulting in gangrene. *Id*. at 200, 164 So. 2d at 765. He alleged further that the doctors had been negligent in diagnosing the problem. *Id*. The doctors and the nurse contended rather that the boy suffered from an unusual allergic reaction to the penicillin, which resulted in the loss of his toes and part of his foot. *Id.* at 201, 164 So. 2d at 766. Ultimately, in considering the issue of res ipsa loquitur, this Court concluded:

> In the case now before us, all of the facts have been presented in evidence. The plaintiff made out a prima facie case of negligence. The cause of the injury is shown to have been an injection of penicillin. The results and circumstances are such as would warrant a jury in finding that the penicillin injection was negligently administered intravenously. On the other hand the defendants have shown that the nurse was competent and skilled, and the child was suffering with a peculiar allergy. ***Both questions are for the jury's determination***...All the facts are before the jury. There is no room for presumptions. All of the inferences are swallowed up in the known facts and circumstances, making up the issue for the determination of the jury. The doctrine of res ipsa loquitur should be applied cautiously, and in this case we have reached the conclusion that the doctrine should not have been applied. There is no necessity to apply the doctrine in the instant case, because the plaintiff made out a prima facie case of negligence, which, in any case, required the defendants to go forward with the evidence. 38 Am.Jur., Negligence, § 289, p. 981. The doctrine does not apply where there is direct evidence as to the precise cause. 38 Am.Jur. § 296, p. 992, supra.

250 Miss. at 212, 164 So. 2d at 771(emphasis added).

¶17. The same is true here. The plaintiffs put forth evidence that the injury to Tammy's leg was a burn and that a heating pad was used during her surgery. Wright and BCH put forth evidence that the injury to her backside was not a burn. The issue then became one of fact for

10

the jury to determine. Thus, we hold that the trial judge did not err in denying plaintiffs' request for a res ipsa loquitur instruction.

**II. WHETHER THE TRIAL JUDGE ERRED IN REFUSING TO ALLOW TESTIMONY BY PLAINTIFFS' EXPERT THAT DEFENDANTS BREACHED THE STANDARD OF CARE PERTAINING TO THE USE OF THE HEATING BLANKET.**

¶18. Plaintiffs contend that the trial judge erred by not allowing their expert, Dr. Robert Tucker, to testify regarding the standard of care for using the heating blanket. Wright and BCH both argue that Tucker was not qualified to testify as to the standard of care. BCH also contends that Tucker was allowed to testify in regard to the standard of care as applied to the hospital and its nurses, and thus there was no error in regard to BCH. BCH argues further that if there was any error, this error was harmless as plaintiffs were able to present their theory of the case through Tucker despite the fact that he was limited in regard to his testimony regarding the standard of care in using the heating blanket.

¶19. Tucker was allowed to testify as to the standard of care regarding the hospital. Specifically, he was asked "Do you have an opinion in this case as to whether or not the fact that a hospital allowed a prescription medical device to be used during surgery without a doctor's order violated the standard of care?" In response he stated that it did violate the standard of care. The trial court, however, noted that it would not allow Tucker to testify regarding the standard of care for nurses or physicians in the use of the machine. The trial judge found, rather, that Tucker could only testify as to whether instructions in the manual were followed. However, later Tucker was asked whether the standard nursing procedures found in the Blanketrol manual were followed, and he replied negatively.

11

¶20.     The trial judge recognized that Tucker was an expert in medicine, pathology, biomedical engineering and with regard to the Blanketrol II unit. Tucker testified that the majority of his medical research centered around burns, pressure necrosis, chemical burns, and electrical burns. He stated that Tammy's injuries were the result of a thermal burn, and after reviewing all of the materials he saw no source of that burn other than the heating blanket which she was on during surgery. Tucker testified about and demonstrated his familiarity with the Blanketrol II unit. He further testified that he was familiar with the Food and Drug Administration's requirements for medical devices and the use of such devices in surgery. Tucker stated that instruction manuals define how to use the equipment properly, specifically defining the minimum educational level and understanding a person must have to operate the equipment. He then explicitly stated that the manual defines the standard of care for the biomedical engineer who cares for the machine and the standard of care for the nursing staff and physicians.

¶21.     Tucker also testified as to BCH's policy that the Blanketrol II unit could be used in any surgical procedure that requires mechanical means to produce normal body temperature that is deemed necessary by the surgeon, the anesthetists, and/or the registered nurse. The policy further states that those operating the device should follow all operating, safety and cleaning procedures contained in the unit's instruction manual. Tucker noted that the manual requires that a physician set the temperature on the device. In spite of the trial judge's earlier ruling, Tucker in fact testified that neither the physician, nor the nurses, monitored Tammy's temperature in the manner instructed by the manual. Tucker stated that the manual contained a statement that those operating the machine should read and understand the instructions in the

12

manual and that the manual should be reviewed semiannually. Tucker testified that the manual warns that if the unit is not used properly then there is a risk of injury. He specifically noted that Tammy suffered from thermal burns and that these burns would not have occurred if the individuals in control of the Blanketrol II unit had exercised reasonable care. He stated that he believed someone had either set the unit at a higher temperature than 98.6 degrees or that it was accidentally bumped and went higher. Tucker was very clear that in his opinion the blanket was the only device in the operating room that could have caused the burns suffered by Tammy. He testified that the operating room staff, including the doctor, nurses, and the certified nurse anesthetist (CRNA) had control of the blanket. Further, after noting that the nurses, CRNA and Wright did not comply with the manual, Tucker stated that if they had done so Tammy's burns would not have occurred.

¶22. As noted, Tucker did testify that he was familiar with the machine and that the instruction manual required a physician to prescribe the use and to dictate the temperature setting. Thus, in spite of the trial judge's initial ruling, the plaintiffs were able to get their theory of the case as to the cause of her injuries before the jury. As Tucker was allowed to testify to this and to the fact that this procedure was not followed on the night of Tammy's surgery, we find that the error was harmless. The plaintiffs were allowed to present their theory of the case through Tucker, and thus the fact that he was not allowed to utter the specific words "Wright and the nurses breached a standard of care," does not constitute reversible error. This issue is without merit.

### III. WHETHER INSTRUCTIONS GRANTED BY THE COURT ON THE POTENTIAL VICARIOUS LIABILITY OF WRIGHT WERE HOPELESSLY IN CONFLICT.

13

¶23. Plaintiffs argue that Instruction P-16 and DW-13A are in conflict and that granting both instructions was reversible error. Instruction P-16 states:

> The Court instructs the jury that in addition to his own negligence, Plaintiffs have alleged that Defendant Wright is responsible for Plaintiff's injuries under a doctrine referred to as vicarious liability. The theory behind this doctrine is that a surgeon has a non-delegable duty to ensure that proper care is given to an unconscious patient in an operating room under the surgeon's control. Under this doctrine, Defendant Wright may be held legally responsible for the negligence of nurses who were working under his direction and control or who he had a right to control.
>
> This doctrine is applicable even if Defendant Wright himself was not personally negligent.
>
> If you find from a preponderance of the evidence that other members of the operating room team were negligent and that these negligent persons were acting under the direction and control of Defendant Wright, and if you further find that such negligence proximately caused injuries to Tammy Winters, then it is your sworn duty to return a verdict against both [BCH] and Defendant Wright.

Instruction DW-13A states:

> The Court instructs the jury that before you may hold Dr. Wright responsible for any alleged negligent act of the nurses or operating room technicians in the operating room at [BCH], you must find from a preponderance of the evidence that Dr. Wright knew or should have known of the alleged negligent acts and if you so find, Dr. Wright is vicariously liable for the alleged negligent acts. And if you do not so find, then Dr. Wright is not liable.

¶24. In applying Mississippi law, the Fifth Circuit stated that "[t]he law imposes liability on a physician for the negligence of a nurse only if the nurse committed the negligent acts or omissions pursuant to the direction and control of the physician." *Hunnicutt v. Wright*, 986 F.2d 119, 124 (5th Cir. 1993). The plaintiffs assert that the DW-13A inserts a knowledge requirement, which is in conflict with P-16 and further that knowledge is not a prerequisite to a finding of vicarious liability.

14

¶25. We find that these instructions are not hopelessly in conflict. Instruction P-16 instructs the jury that Dr. Wright may be responsible for the negligence of nurses or technicians "who were working under his direction and control or who he had a right to control." Instruction DW-13A instructs that Dr. Wright may be responsible for such negligence if "he knew or should have known" of such acts. This Court does not approve this instruction, and the bar is cautioned against using such an instruction. However, these instructions read together are not in actual conflict under the facts of this case, and we find no error in giving this instruction. If Dr. Wright had directed the acts or had a right to do so, then it follows that he knew or should have known about them.

¶26. Dr. Wright testified repeatedly that he was unaware that the blanket was on the table. Further, operating room technicians and nurses testified that the heating blanket stayed on the table in that particular operating room and that it was routinely used by the nurses without direction by the physician. As the Fifth Circuit has stated, "[t]he routine acts of treatment which an attending physician may reasonably assume may be performed in his absence by nurses of a modern hospital as part of their usual and customary duties, and execution of which does not require specialized medical knowledge, are merely administrative acts for which negligence in their performance is imputable to the hospital." *Hunnicutt*, 986 F.2d at 123 (citing *Clark v. Luther McGill, Inc.*, 240 Miss. 509, 127 So. 2d 858, 861 (1961)). Thus, there must be some connection be it actual or imputed knowledge of the negligent act by the physician. We find this allegation of error to be without merit.

IV. **WHETHER THE TRIAL JUDGE ERRED IN REFUSING TO GRANT A PEREMPTORY INSTRUCTION ON THE ISSUE OF**

15

## THE USE OF A PRESCRIPTION MEDICAL DEVICE WITHOUT A PRESCRIPTION.

¶27.    The plaintiffs requested the following peremptory instruction, P-4, regarding the impropriety of the use of the heating blanket:

> The Court instructs the jury that under certain circumstances negligence is conclusively presumed as a matter of law and cannot be rebutted.
>
> In this case, a prescription medical device was used by hospital personnel without a doctor's order.
>
> Such action is a violation of FDA rules and regulation and constitutes negligence as a matter of law.
>
> If you find by a preponderance of the evidence that such negligence proximately caused the Plaintiff's injuries, then you must return a verdict for the Plaintiff and against Defendant [BCH].

The trial judge summarily refused this instruction.  The plaintiffs argue that this was error. Wright and BCH both contended at trial and now on appeal that the blanket is not a prescription device, however, they have yet to put forth any proof of this contention.  Rather, they have continued to argue that the plaintiffs did not put forth any evidence beyond the Blanketrol II instruction manual.  They argue further that use of the blanket was a necessity, and thus it could not have been negligence to use the blanket.

¶28.    The manual states that "[t]he desired setpoint temperature should be set only as prescribed and under the order of a physician."   In the pre-trial statement pursuant to court order, Sub-Zero stated that "[t]he Blanketrol is a prescription device to be used only under order of a physician and used at a temperature ordered by a physician."   Circulating Nurse Tolbert admitted on cross-examination that she had read in the manual that the Blanketrol II

16

was "a prescription medical device" and that it should not be used "except with the order of a physician." This Court has stated that in regard to prescription medicine

> '[The package insert] is not conclusive evidence of standard or accepted practice in the use of the drug by physicians or surgeons, nor that a departure from such directions is negligent. ***But it is prima facie proof of a proper method of use, given by the maker, which must be presumed qualified to give directions for its use and warnings of any danger inherent therein*.'**

> The prescribing physician can be permitted to rebut this implication and explain its deviation from the manufacturer's recommended use on dosage. The holding will shift the burden of persuasion to the physician to provide a sound reason for his deviating from the directions for its use, and will require corroborative evidence to determine whether the physician met or violated the appropriate standard.

***Thompson v. Carter***, 518 So. 2d 609, 613 (Miss. 1988) (quoting ***Julien v. Barker***, 75 Idaho 413, 272 P.2d 718 (1954)). The plaintiffs argue that the manual is prima facie evidence that the unit is a prescription device. They contend further that because Miss. Code Ann. § 73-25-33 (Rev. 2000) defines the practice of medicine as prescribing such a device for cure or relief of an injury and Miss. Code Ann. § 73-25-1 (Rev. 2000) requires one to obtain a license prior to practicing medicine, it was negligence per se for the staff to have utilized the blanket without the order of a physician.

¶29. Wright and the plaintiffs' expert, Tucker, testified that the use of the heating blanket was required because of Tammy's low core temperature prior to surgery. Further, Wright testified that the nurses were responsible for the unit. He also stated that the use of the blanket was an absolute medical necessity under the circumstances and that it was the proper standard of care. We find, however, that this testimony does not rise to the level of rebuttal as to the allegation that the Blanketrol II unit is a prescription medical device. The jury found no liability as to

BCH or Wright. Thus, it would appear that the jury found either that her injury was not due to the heating blanket or that it was not negligence to have used it. The denial of the instruction was harmless, particularly considering the fact that the jury heard testimony that the device was a prescription medical device. We find this allegation of error meritless, or at the most harmless error.

## V. WHETHER THE TRIAL JUDGE ERRED IN ALLOWING DEFENDANTS TO ASK LEADING QUESTIONS OF EACH OTHER'S WITNESSES.

¶30. The plaintiffs contend that the judge erroneously allowed BCH and Wright to ask one another's witnesses leading questions. Leading questions were asked, examples of which are:

BCH counsel to Wright:

> In fact, it would have been below the standard of care not to have used it [the Blanketrol unit] wouldn't it?

BCH counsel to Wright:

> In fact, Dr. Wright, it was an absolute medical necessity to use this blanket on this patient this night under these circumstances, wasn't it?

Wright's counsel to Pam Williams (BCH witness):

> Okay. So Tammy Winters had already gone to Ms. Guice down in Biloxi and threatened to sue the hospital when Marla talked to you; is that correct?

¶31. BCH and Wright contend that it was appropriate for them to ask leading questions as they were cross-examining witnesses and they are not aligned parties as they have adverse interests. Rule 611(c) of the Mississippi Rules of Evidence states that "[o]rdinarily, leading questions should be permitted on cross-examination. When a party calls...an adverse party, or

18

a witness identified with an adverse party, interrogation may be by leading questions." This Court has stated that "[i]t is within the trial judge's discretion to allow leading questions, and unless there has been an abuse of discretion to the prejudice of the complaining party, it is not reversible error." ***Jones v. State***, 606 So. 2d 1051, 1059 (Miss. 1992).

¶32. The trial judge spent much time considering this issue. He ultimately determined that there was sufficient adversity as to the theories of defense for each party to consider them adverse, and thus he allowed them to ask leading questions of one another's witnesses. Considering that one of Wright's theories of defense was that if the jury determined the blanket was the cause of Tammy's injuries then the hospital was at fault, not him, we find that the trial judge did not abuse his discretion. Thus, we find this allegation of error to be meritless.

### VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW PLAINTIFFS' EXPERTS AND PARTICIPANTS IN THE OPERATION TO TESTIFY REGARDING WRIGHT'S CONTROL OVER THE OPERATING ROOM.

¶33. The plaintiffs assert that the trial judge erred in not allowing witnesses to state affirmatively that Wright was in control of the operating room. BCH and Wright contend that the conclusory statement plaintiffs wished to elicit from witnesses is a fact determination that falls within the province of the jury. Both the Fifth Circuit in ***Hunnicutt***, 986 F.2d at 122-23, and this Court in ***Starcher v. Byrne***, 687 So. 2d 737, 742 (Miss. 1997), recognized that physicians may not have control over every happening in the operating room. Wright did concede in his testimony that he was responsible for Tammy. Further, during cross-examination of operating room technician, Pam Smith, the plaintiffs' counsel elicited an affirmative response to several questions regarding whether or not she would have followed

19

the doctor's orders in using the Blanketrol II unit. The trial judge also granted Instruction P-16, discussed above. Thus, plaintiffs' theory of the case in regard to Wright being responsible for the operating room, and thus vicariously responsible for any injury to Tammy that might have been caused by others in the operating room, was before the jury. We find that the issue of control is an issue of fact that should have been decided by the jury. Thus, trial judge did not err in precluding witnesses from providing a conclusion that lies more appropriately within the province of the jury.

## CROSS-APPEAL ISSUES

¶34. We find that there is no need to discuss the cross-appeal issues, as we affirm the judgment below. The issues raised by BCH, however, are issues within the discretion of the trial judge, and we conclude that the trial judge did not abuse his discretion in ruling the way he did. First, as to the extension of a scheduling order, this case dragged on for quite a while, and the judge had been quite lenient with extensions. While it is true that counsel changed, the central party, BCH, never altered. Second, as to the issue of whether the judge improperly excluded evidence of Tammy's ingesting alcohol on the evening of her injury, the judge found that the evidence would be too prejudicial. Further, BCH only had testimony that she had been drinking. It had no concrete testimony as to blood alcohol level. Thus, the trial judge was correct in excluding this evidence, as any probative value is far outweighed by the prejudice to the plaintiffs.

## CONCLUSION

¶35. First, the trial judge did not err in denying the plaintiffs' request for a res ipsa loquitur instruction. Second, while we agree that Tucker should have been allowed to testify regarding

20

the standard of care as to the use of the heating blanket, we find this to be harmless error. Third, the instructions regarding Wright's vicarious liability for actions of the operating room personnel were not in conflict. Fourth, we find no error in the trial court's denial of the plaintiffs' request for a peremptory instruction regarding the heating blanket. Fifth, the defendants were sufficiently opposed so that it was proper for them to ask leading questions to witnesses called by one another. Finally, it was not error for the trial judge to exclude testimony regarding Wright's control of the operating room. For the foregoing reasons, we affirm the judgment below.

¶36. **AFFIRMED.**

**WALLER, COBB, AND CARLSON, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.; McRAE, P.J., JOINS IN PART. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**PITTMAN, CHIEF JUSTICE, DISSENTING:**

¶37. I agree with the plurality's opinion that the trial court did not (1) err in denying the res ipsa loquitur jury instruction, (2) err in refusing to allow the Winterses' expert to testify regarding the standard of care of use of the heating blanket, (3) give conflicting jury instructions, and (4) err in allowing defense counsel to pose leading questions to each other's witnesses. I part company with the plurality where it concludes the trial court did not commit error when it prevented witnesses from testifying regarding Wright's control of the operating room. This was indeed error. Our rules of evidence are not meant to be as strictly construed as the plurality opinion does today. I also think it was more than harmless error for the trial

21

court to refuse plaintiffs'' tendered peremptory instruction regarding the heating blanket. These errors warrant reversal, therefore, I respectfully dissent. I would reverse the trial court's judgment and remand for a new trial.

¶38.	According to our rules of evidence, the presentation of evidence in our trial courts embraces the opinions by experts as well as lay witnesses.  M.R.E. 701 & 702.  Where a witness is in a position to observe facts from which he can formulate opinions, that witness's opinion is relevant and admissible testimony if it is helpful to the trier of fact, even though it may embrace an ultimate issue to be decided by the jury.  M.R.E. 704.  *See also* **Jenkins v. CST Timber Co.**, 761 So. 2d 177, 181 (Miss. 2000).  In this case, the witnesses who were called by the plaintiffs' to testify were present in the operating room and observed the procedure and how Wright maintained discipline in the room during the operation.  They had the factual basis from which they could formulate conclusions whether Wright was in control of the operating room.  Their testimony is helpful to the jury because it would have provided the jury with the opinions of trained medical personnel whose observations that day were based upon the facts and tempered by the life experiences each brought with them to the operating room.  I think such testimony would have been valuable to the jury when it considered how much control over the situation Wright had and whether there was negligence.

¶39.	I, therefore, disagree with the plurality that this testimony is inadmissible because it invades the province of the jury.  It was admissible under our rules of evidence, and it was error to exclude the testimony.  Operating against the plurality is its own attempt to bolster its argument by restating other facts these witnesses were allowed to tell the jury and referring to the jury instructions which were granted.  This is the beginning of a harmless error analysis.

22

It is not support for the proposition that the trial court did not err in excluding this valuable testimony because the question of control was one for the jury. The issue of control is an issue of fact, but one upon which lay observers of the facts can properly form opinions and give helpful testimony to the jury. Therefore, the plurality is incorrect when it says this is not error.

¶40.    Turning now to the negligence per se instruction, the plurality correctly concludes that Wright offered insufficient testimony in rebuttal to the plaintiffs' argument that the instruction should have been given. However, the plurality also finds that it was harmless error to refuse plaintiffs' tendered instruction on negligence per se with regards to the unauthorized use of a prescription heating blanket. The plurality finds support for its argument in the jury's verdict, where it can be concluded that the jury either determined that the blanket was not the proximate cause of the injury or that it was not negligence to have used it. I must take issue with this argument. If this Court could definitively state that the jury rejected liability based upon insufficient proof of proximate cause, then this issue could be put to rest. Since it cannot, I think the trial judge should have given the negligence per se instruction. There is an evidentiary basis in the record to support giving P-4, and it was unrebutted that the blanket required a prescription for use.

¶41.    The standard to be applied by a trial court when determining whether to give certain tendered instructions is quite liberal. "A party to an action is entitled to have the jury instructed regarding a genuine issue of material fact so long as there is credible evidence in the record which would support the instruction." *Hill v. Dunaway*, 487 So. 2d 807, 809 (Miss. 1986). In the instant case, the uncontradicted evidence indicates that the blanket required a

23

prescription before it could be used. We do not need to address at this stage whether the quality of care provided to Tammy Winters fell below the appropriate standard of care. The instruction limits itself to the question of whether the blanket was properly used. The facts indicate that it was not prescribed by a physician's order as our laws require. Therefore, its use here was negligence per se. *See* Miss. Code Ann. §§ 73-25-1 & -33 (Rev. 2000). Where the jury instructions do not fairly or adequately instruct the jury, this Court can and will reverse. ***Paracelsus Health Care Corp. v. Willard***, 754 So. 2d 437, 447 (Miss. 1999) (citing ***Lovett v. Bradford***, 676 So. 2d 893, 897 (Miss. 1996)). The plaintiffs were entitled to the negligence per se instruction, and it was more than just harmless error to refuse the instruction.

¶42. In my opinion, the trial judge committed two errors: excluding the lay opinion testimony of the knowledgeable witnesses who could answer whether Wright was in control of the operating room and refusing to give the negligence per se instruction, P-4. These errors, when taken together, restricted testimony and inadequately instructed the jury to the extent that the plaintiffs were not provided a meaningful day in court. Therefore, I would reverse the judgment below and remand this case for a new trial.

**GRAVES, J., JOINS THIS OPINION. McRAE, P.J., JOINS IN PART.**


**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶43. There is no majority in this case. Presiding Justice Smith has the plurality, and the trial court's judgment is affirmed by this equally divided Court. Again, the "voiding" of Justice Diaz's votes by the "majority caucus" has manipulated the system. If Justice Diaz's vote in this matter had been allowed to stand, then either Chief Justice Pittman or I would have secured the

24

majority in this case which would have led to a reversal. The "voiding" of Justice Diaz's votes has resulted in the outcome of yet another case being manipulated by a divided Court with less than nine Justices participating. Furthermore, while I agree with Chief Justice Pittman's dissent as to the need for a reversal and remand of this case, I write separately only to emphasize my position that the trial court also erred by refusing the res ipsa loquitur instruction.

¶44. This case meets all the elements required for a res ipsa loquitur instruction. Tammy Winters was required to have emergency surgery as a result of a gunshot wound. A heating blanket was placed underneath her body during surgery to stabilize her core body temperature. The heating blanket caused severe burns. Dr. Wright claims he did not know the heating blanket was being used, yet he said it was necessary to help keep the patient alive during surgery. Two technicians and a nurse in the operating room saw the burn marks on the back of the patient. Winters incurred over $100,000.00 in medical expenses to treat the third degree burns to her back side. At trial, testimony regarding Dr. Wright's control in the operating room was not allowed and a res ipsa instruction was later denied. Based on these errors alone, this case should be reversed and remanded. As the plurality correctly states, this Court will reverse where the jury instructions do not fairly and adequately instruct the jury. *Paracelsus Health Care Corp. v. Willard*, 754 So.2d 437, 447 (Miss. 1999) (citing *Lovett v. Bradford*, 676 So.2d 893, 897 (Miss. 1996)). To be entitled to an instruction on res ipsa loquitur, the plaintiff must show that (1) the event must be one that would not normally occur absent someone's negligence; (2) the injury is such that in the ordinary course of things it would not occur if those in control of the instrumentality used proper care; and (3) the plaintiff must not

have voluntarily contributed to the event. *Coleman v. Rice*, 706 So.2d 696, 698 (Miss. 1997) (quoting *Erby v. North Miss. Med. Ctr.*, 654 So.2d 495, 500 (Miss. 1995)). The evidence clearly showed that Winters was burned by the heating blanket during surgery. In fact, the plurality even states that "Tammy offered such expert testimony that the tissue was burned due to the heating pad." Just because the defense presented their own expert witness who disagreed with this analysis does not negate the fact that Tammy presented sufficient evidence for a res ipsa loquitur instruction. Surely, third-degree burns during operations are not a normal occurrence without some form of negligence. Clearly, Winters would not have sustained the burns if Dr. Wright and his staff had followed the use directions for the heating blanket. Winters was unconscious and could not have voluntarily acted in anyway to injure herself with the heating blanket. Winters presented ample evidence to support an instruction on res ipsa loquitur. The denial of the instruction was a reversible error as the jury was not properly and adequately instructed.

¶45. For these reasons, I would reverse the trial court's judgment and remand this case for a new trial. Accordingly I dissent to the findings reached by the plurality and concur with Chief Justice Pittman's dissent, even though it fails to recognize reversible error as to the trial court's refusal to give the res ipsa loquitur instruction.